```
 1              IN THE UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF ARKANSAS
 2                       WESTERN DIVISION

 3   MARK MOORE,

 4                   Plaintiff,

 5       v.                            No. 4:14CV00065 JM

 6   MARK MARTIN, in his official      December 12, 2017
     capacity as Secretary of State    Little Rock, Arkansas
 7   for the State of Arkansas,        9:33 a.m.

 8                   Defendant.

 9              TRANSCRIPT OF BENCH TRIAL
           BEFORE THE HONORABLE JAMES M. MOODY JR.,
10                 UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   On Behalf of the Plaintiff:

13       MR. JAMES C. LINGER, Attorney at Law
            Law Offices of James C. Linger
14          1710 South Boston Avenue
            Tulsa, Oklahoma  74119-4810
15
         MR. JEFFREY M. ROSENZWEIG, Attorney at Law
16          300 Spring Street, Suite 310
            Little Rock, Arkansas  72201
17

18   On Behalf of the Defendant:

19       MR. A.J. KELLY, General Counsel/Deputy Secretary of State
            Post Office Box 251570
20          Little Rock, Arkansas  72225-1570

21       MR. MICHAEL J. FINCHER, Associate General Counsel
            Arkansas Secretary of State
22          500 Woodlane Street, Suite 256
            Little Rock, Arkansas  72201
23

24       Proceedings reported by machine stenography and displayed
     in realtime; transcript prepared utilizing computer-aided
25   transcription.
```

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

**I N D E X**

DEFENDANT'S OPENING STATEMENT - BY MR. KELLY..............12

PLAINTIFF'S OPENING STATEMENT - BY MR. LINGER............22

| WITNESSES FOR THE DEFENDANT: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| JOSH BRIDGES | 28 | 89 | 126 130 | 130 |

| WITNESSES FOR THE PLAINTIFF: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| MARK MOORE | 132 | 133 | | |

MOTIONS...................................................136

DEFENDANT'S CLOSING ARGUMENT - BY MR. KELLY..............137

PLAINTIFF'S CLOSING ARGUMENT - BY MR. LINGER.............149

**EXHIBITS:**                                          **RECEIVED**

Defendant's Exhibits 1 through 187.......................11

Plaintiff's Exhibits 1 (upper portion), 2 and 3.........12
Plaintiff's Exhibit 1 (bottom portion)..................136

```
1                       P R O C E E D I N G S
2           THE COURT:  Good morning.  We're on the record in
3   Moore versus Martin, civil case No. 4:14CV65, here on round two
4   of a remand of the Eighth Circuit.  Y'all have read the opinion,
5   I'm sure, and so I'm not going to go into precisely what it
6   said.  I want to give you the benefit of what I've reviewed
7   coming into this hearing.  I reviewed both plaintiff's and
8   defendant's pretrial briefs.  I reviewed the entire transcript
9   from the cross-motions for summary judgment hearing that we had
10  July the 27th of 2015 -- wow, it doesn't seem like it was that
11  long ago -- as well as the opinion in this case in the Eighth
12  Circuit, which was 15-3558.
13          I want to let you know in advance that I would like to
14  focus this hearing today on the factual deficiencies.  I know
15  you all took the position there weren't any disputed facts in
16  the last case, but we have to deal with the factual deficiencies
17  that exist.  So if you all could concentrate your presentations
18  today on what the Eighth Circuit deemed necessary for me to
19  determine to rule on this case, I would like to do that.  I
20  don't know what position each of you have with regard to the
21  matters that were placed before me in the motion for summary
22  judgment, but I would like to either consider those arguments
23  made in this case so you don't have to remake them or take
24  judicial notice of that.  I'm not sure how that works.  But
25  sometimes, at least in a nonjury trial, I can use that
```

1    transcript in this trial on the merits, so to speak, without

2    having to replow that ground.

3              MR. LINGER:  That would be acceptable to the

4    plaintiff, that you take judicial notice of it.

5              THE COURT:  All right.  Mr. Kelly, how about you?

6              MR. KELLY:  That's acceptable, Your Honor.

7              THE COURT:  Thank you.

8              MR. KELLY:  I'm not sure that I can fashion everything

9    around that, but I'll do my best.

10             THE COURT:  Well, I understand there's going to be

11   some overlap and some talk about the other stuff.  It's just

12   that I don't want to spend the time we spent on those motions

13   going over things that I've already heard once and just read

14   recently.

15        So even though this is a trial, it appears, based on my

16   reading of the Eighth Circuit case, that it would be your

17   burden, Mr. Kelly, at this time.  And so instead of plaintiff

18   going first, I think the posture of what I understand these

19   proceedings to be, I'm going to allow you to go first, since you

20   have the burden, because two of my three findings were affirmed,

21   the last being an element that you would need to prove.  Is that

22   fair enough?  Do you agree with my reading of the opinion?  You

23   don't have to agree with the opinion, but do you agree with my

24   interpretation of it?  And I'll see if I can find specifically

25   where the findings were made.  I'll get out the dissent and back

1    into the --

2         MR. KELLY:  Your Honor, that may be the appropriate

3    method to proceed.  Here is my procedural objection.

4         THE COURT:  Okay.  I'm listening.  I'm just looking.

5         MR. KELLY:  The court, the Eighth Circuit, affirmed

6    your denial of plaintiff's motion for summary judgment.  That

7    is, they did not prove their prima facie case.

8         THE COURT:  Understood.

9         MR. KELLY:  So I believe that they have the burden of

10   putting on that case first.  I'm happy to do it because you do

11   have -- my understanding of the rules of evidence, you can

12   control the flow, and it probably does work better to do it the

13   way you suggest, and we're prepared to do that.

14        THE COURT:  Well, I'm trying to get back to the page

15   where --

16        MR. KELLY:  I'm looking at the slip op.  Are you

17   looking at something else?

18        THE COURT:  I'm looking at the opinion in this case,

19   which essentially puts us in phase three, that I was correct in

20   finding that -- I'm looking for the exact language in there.

21   I'm on page 5, at the top, thinking that's where it is.  Oh,

22   here it is.  That I correctly found, according to them,

23   "... that the March deadline for filing as an independent

24   candidate placed a substantial burden on Moore's rights," so

25   that has been established, and "that Arkansas has compelling

1    interest in timely certifying candidates and initiatives to the

2    general election ballot."  And so I'm left with determining as a

3    matter of fact whether the March deadline is narrowly tailored

4    to serve that interest.

5         And so of the three things that I needed to do, two have

6    been done and certified by the Eighth Circuit -- and "certified"

7    is probably not a better word.  But affirmed.  So as I see it,

8    this hearing today is to determine as a matter of fact whether

9    the deadline is narrowly tailored to serve the state's interest.

10        So I'm not sure what's left for the plaintiff to prove in

11   its motion for summary judgment since y'all each have one point

12   and we're here for the tiebreaker, basically.  I mean, they have

13   established that it placed a substantial burden, and you've

14   established that you have a compelling interest, and the

15   question is, is the remedy narrowly tailored to address your two

16   interests.  And so if I can narrow it to that, without using the

17   "narrow" word too often, that's how I interpret the Eighth

18   Circuit's directive to me.

19             MR. KELLY:  Your Honor, I beg to differ in this sense.

20   I believe it was a reversal of granting summary judgment, so

21   remanding for full trial, and again affirmed your denial of

22   plaintiff's motion for summary judgment.  And please don't

23   forget, because this is critically important to our case, one of

24   the other plaintiffs declined to appeal.  We possess a judgment

25   on the merits that this law is valid as to that plaintiff and

1    others like him.

2        So I believe that the plaintiffs do have a burden, and

3    their burden is the same as it was before because the court said

4    they did not meet it.  It might have been only two judges, but,

5    still, two out-ruled the one.

6            THE COURT:  Well, I read the opinion that said I

7    correctly, or had sufficient facts to determine element one and

8    element two, it's just I should have denied both of your motions

9    for summary judgment because the record is devoid of any facts

10   to establish narrowly tailored.  And that's how I read the

11   judgment.  That while I got two of the three elements correct, I

12   had insufficient evidence to rule on that third step, and that's

13   why they sent it back and remanded it for findings on that

14   issue.

15           MR. KELLY:  And my belief is they remanded it for a

16   full-blown trial.

17           MR. LINGER:  Your Honor, just for the record, I would

18   say I agree with the Court's interpretation.  I think you'll see

19   at the very end of the two-man majority decision where they talk

20   about the record being unclear, so they think that that's what

21   the record needs to be supplemented and explained more fully.

22   And the burden is on the Secretary of State since you said it

23   has a significant impact on plaintiff's rights, therefore they

24   must show that this is narrowly tailored and is necessary.  And

25   that's what -- and they have five questions, I think if you look

1    at it, and that's on 1028 of the published opinion, they have

2    five questions they want the Court basically to answer.

3                THE COURT:  Okay.  Do you have the opinion with the

4    published numbers?  Because what I'm dealing with is page 1

5    through --

6                MR. KELLY:  I have the slip opinion as well, Your

7    Honor.

8                MR. LINGER:  A copy of the published decision, and the

9    one I got sent to me I actually wrote out in the margins what

10   pages things were on.

11               THE COURT:  Really what I'm asking you to do is direct

12   me to those five things you're referring to, because I

13   understand that you're properly annotating what you're talking

14   from, but to get on that page, if you'll help me what the

15   paragraph begins with, I can scan through it.

16               MR. LINGER:  What I have of the opinion they filed, it

17   was on page -- let's see.  I believe it was on page 10 --

18               THE COURT:  Starting with, "Notwithstanding the

19   district court's and the parties' description"?

20               MR. LINGER:  Yes.

21               THE COURT:  Is that where you are?

22               MR. LINGER:  Yes, Your Honor.

23               MR. KELLY:  Which page, Your Honor?  Page 8?

24               THE COURT:  I'm on page 10, last paragraph of the slip

25   opinion.

1          MR. LINGER:  And it's on pages 10 and 11 of the one

2    they filed, but it is on page 1028 is where they set forth five

3    things, which are basically what period of time -- I said it on

4    page 5 of my disclosure sheet.  But it has what period of time

5    between the former May 1st deadline for independent candidate

6    petitions and the early July deadline for initiative petitions

7    were available for the state to process independent candidate

8    petitions.  And then the second one they want to know is, when

9    were the --

10         THE COURT:  All right.  I'm not going to ask you to

11   read the paragraph.  But it's my understanding from reading this

12   and the way we're going to proceed today -- noting your

13   comments, Mr. Kelly -- is that this is essentially a remand for

14   me to establish the findings of fact that are set forth,

15   notwithstanding the district court's paragraph, which appears on

16   page 10 of my copy -- and what page of the published copy?

17         MR. LINGER:  I believe it's 1028, Your Honor.

18         THE COURT:  Okay.  And so I'm using the information

19   that was provided in the motion for summary judgment hearing and

20   the guidance from the Eighth Circuit to state that the first two

21   legs of the analysis, which we discussed a minute ago, it

22   provided a burden that the state has an interest have been

23   decided, and we'll be here today to clean up those factual

24   issues that the court, meaning the Eighth Circuit court, said

25   there was a lack of evidence on.  And those, I'll take your word

1    for it, Mr. Linger, are the five elements or five factors

2    issued, however you want to describe that, that I need to find

3    to decide this case.  So I'd ask that y'all focus your

4    presentations today on those matters, which puts me back to

5    believing, Mr. Kelly, that you have the burden of proof on the

6    third element to establish those factual questions that the

7    Eighth Circuit had for me to determine, which is the second to

8    last paragraph of the majority opinion.

9         Do you want to make any other record before we get started?

10             MR. KELLY:  No, sir.  I'll probably have just a short

11   opening statement, and I will probably be working off of

12   Exhibit 1.  So I apologize.  I've lost track of how many sets of

13   the exhibits we have.  I don't know if Mr. Linger objected and I

14   haven't given you a copy or you have a set of proposed exhibits.

15   And I have one additional set, which is the original.

16             THE COURT:  I have plaintiff Mark Moore's trial

17   exhibits.  I'm not sure I have yours, Mr. Kelly.

18             MR. KELLY:  Of course, my originals are not numbered.

19             THE COURT:  I've got it.  It didn't make it up the

20   ladder.

21             MR. KELLY:  My wonderful staff has numbered the

22   exhibits by page number, so I'm going to be referring to them by

23   the page number that they appear in that packet, and they're

24   labeled accordingly.

25             THE COURT:  Mr. Linger, do you have any objection to

1  any of the documents that are marked SOS, Secretary of State,

2  Exhibit 1 through 103?

3            MR. KELLY:  187, Your Honor.

4            THE COURT:  Oh, I'm sorry.  There's a second page.

5  Got it.

6            MR. LINGER:  Your Honor, while I reserve the right to

7  later argue whether some are material, for purposes of moving

8  things along, we have no objection that these be received into

9  evidence.

10           THE COURT:  All right.  Then Secretary of State's

11  Exhibits 1 through 187 will be received.

12       (Defendant's Exhibits 1 through 187 received in evidence.)

13           THE COURT:  Mr. Kelly, I need to ask you what your

14  position is on Plaintiff's 1 through 3, I guess.

15           MR. KELLY:  On Exhibit No. 1, we don't object to the

16  timeline, but it is the editorial comment in the footnotes

17  that's a problem for us.

18           MR. LINGER:  Those footnotes, Your Honor, are what my

19  client prepared in preparing that exhibit, and they're simply

20  his opinion of interpretation.  So for that reason I'd ask it be

21  allowed to be received in evidence, with that caveat.

22           THE COURT:  Mr. Linger, I'm not sure I understood the

23  argument why your client's opinion -- I haven't read them, so

24  I'm not sure what he means about the interpretation.  I'm going

25  to receive the top half of it for now.  I'm not rejecting the

1    other part.  I'm just not receiving it as stipulated to at this

2    point.

3        So is that fair to say that everything above paragraph 1

4    can be received, Mr. Kelly?

5              MR. KELLY:  Yes, sir.

6              THE COURT:  Okay.  Next?

7              MR. LINGER:  I don't think they had an objection to 2

8    and 3.

9              MR. KELLY:  No objection to number 2.  Number 3, our

10   objection is that's legal material and is not really a proper

11   exhibit.  I understand that finding in that opinion is a very

12   difficult thing and I understand why he wants to give it to the

13   Court.

14             MR. LINGER:  We have the case in the Eighth Circuit.

15   They specifically asked me to send them a copy of that, which

16   was unpublished.

17             THE COURT:  Then I'm going to receive Exhibit 3 for

18   the convenience of any reviewing court so they'll have it handy.

19        (Plaintiff's Exhibits 1, upper portion, 2, and 3 received

20   in evidence.)

21             THE COURT:  All right.  Mr. Kelly, you have the floor.

22             MR. KELLY:  Just a short opening, Your Honor.  I'm

23   going to talk about Exhibit 1 and then call Josh Bridges to the

24   stand.  He's our primary witness.  I don't anticipate calling

25   anybody else.

1          THE COURT:  Let me get to your Exhibit 1, which is --

2          MR. KELLY:  I have one large print version of that,

3     Your Honor.  Unfortunately, I didn't bring one for everybody,

4     including myself.  But if you would like a larger print version,

5     I have it for you.

6          THE COURT:  No, I can see it with the aid of my

7     glasses, at least the first page of it.

8          MR. KELLY:  What's on Exhibit 1 essentially are the

9     agreed and understood primary -- I shouldn't use the word

10    "primary" -- uncontested, undisputed election law deadlines in

11    the State of Arkansas for the --

12         THE COURT:  Let me ask, you ought to do one thing for

13    me, because Genie's new to this case, and the differences

14    between events are very close to one another, whether it's the

15    preferential primary or -- it's a lot of alliteration.  So could

16    you all slow down your comments when we get to that, because

17    even as much as I've read this, distinguishing between these

18    various elections and filing deadlines can be harder to take

19    down, especially when you're new to it.  I'm just going to ask

20    that, when we go to nonpartisan petition period stats, we kind

21    of slow down that language, all of us, for the benefit of Genie.

22      Go ahead, Mr. Kelly.  I'm sorry.  You were getting rolling

23    on the timeline.

24         MR. KELLY:  Slowing me down is a good thing.

25         THE COURT:  Okay.

1          MR. KELLY:  We start on this timeline, for purposes of

2    the Court's review, it looked like the easiest thing to do was

3    use the next year's calendar, the '18 calendar.  It's similar to

4    the '14.  It's dissimilar to the '16 calendar.  For your

5    purposes, for our purposes, it looks like these are agreed

6    deadlines in a general election in the state of Arkansas.

7          Number 23, November 6, 2018, the general election, one of

8    the most important things to remember is that a fundamental

9    principle of Arkansas law is that all litigation concerning an

10   election must be resolved before the end of the day on election

11   day, otherwise, under state law, everything goes away; that is,

12   the plaintiff essentially loses because he or she failed to get

13   a decision on the merits of the case before the close of the

14   polls.  That's a fundamental principle I just want to make sure

15   is clear for our purposes.  It's understood by most election law

16   attorneys.  It's not always understood in a reviewing court.

17         When you work your way backwards from that date, so I'll

18   work my way backwards, slowly, and then I'll have Mr. Bridges

19   come forward and show you how other deadlines are inserted

20   between what's agreed here and try to address specifically the

21   Eighth Circuit's issues that they've directed us to address.

22         The period of early voting is not a disputed thing, other

23   than it's understood and it is important for our purposes.

24   Early voting in Arkansas did not take place until 1995.  That's

25   a significant fact for this reason.  The *Langguth* decision is

1    1994.  So that is a change in the factual circumstances of how

2    elections are conducted in Arkansas.  Early voting, two weeks

3    for the general, also two weeks for the preferential primary

4    election, only one week for the general primary election.  And

5    I'm going to work my way back so you don't have to worry.  I'm

6    just trying to highlight for you issues that come up.

7         One of the other critically important things which was not

8    addressed by the Eighth Circuit, and because it was not

9    addressed by the Eighth Circuit, it is still an issue that we

10   can pursue and that we intend to pursue, number 21 is the UOCAVA

11   deadline.  UOCAVA, a short acronym, U-O-C-A-V-A, for Uniform and

12   Overseas Citizens Voting Act.  I honestly don't remember what

13   the last three letters are, but it's irrelevant.  Military

14   overseas voters are entitled to have their ballots delivered

15   45 days prior to an election under federal law.  That law, a

16   2009 law, the federal government firmed up the deadlines and

17   made that 45 days, a change in election law in every state in

18   the country.  That turns out to be a critical date because it

19   affects all of the other deadlines involved in preparing for the

20   general election.

21        You go backwards, towards ballot draw and the certification

22   of names, that's 18 and 19, Mr. Bridges is going to testify how

23   significant ballot draw is; that's the position of names on the

24   ballot, commonly understood, but, again, a new law clerk in the

25   court of appeals might not understand it.  In Arkansas, every

1    county conducts their own separate ballot draw so that it is not

2    uniform throughout the state.  That is intended to give

3    candidates a better opportunity to be listed first on the

4    assumption that the first listed candidate has a slight

5    advantage over other listed candidates.

6         One of the other things that's, again, not inherent -- I'm

7    sorry.  One of the other things that's not explicit in Arkansas

8    law but is important when we talk about initiative and referenda

9    petitions and the litigation that ensues from them --

10             THE COURT:  And that's referenced as I and R?

11             MR. KELLY:  Yes, sir, I and R, correct.  In initiative

12   and referendum litigation, that is a binary issue, that is, it's

13   a yes and no vote, and the normal judicial remedy, if an

14   initiative is placed on the ballot, the remedy is not to count

15   either the yeses or the nos.  That kind of remedy, however,

16   cannot obtain in a three-person race where candidates are

17   involved.  Why?  To not count the votes for one candidate is

18   only a partial remedy; you are taking votes away from whatever

19   candidates remain if there's a valid signature challenge to an

20   independent candidate.  That is why having all litigation end

21   for an independent candidate signature challenge is critical to

22   have happen before certification of the names on the 18th of

23   August.  That is again not explicit in the law.  It is simply a

24   fact of how elections work.  If you have a Republican and a

25   Democrat and a Libertarian Party candidate with an independent,

1    that independent candidate could sway the outcome of the

2    election.  So the litigation has to be resolved by the 18th of

3    August, that's the certification deadline, otherwise the remedy

4    is insufficient because people will start voting without knowing

5    what the outcome of the election is and it is too late to take

6    someone's name off or to put someone's name back on.  And there

7    is actually an example in our list of exhibits how that happened

8    in 2008 -- 2006, just before, two years before, three years

9    before the UOCAVA and MOVE Act deadlines were put in place; MOVE

10   Act, M-O-V-E, again, the change to the UOCAVA law.

11          Working backwards from the 18th of August to number 17,

12   which is the initiative and referendum deadline next year on

13   July 6th, the Eighth Circuit cited to the Arkansas Constitution

14   which says the Secretary of State will have 30 days to evaluate

15   an initiative and referendum petition on a cure, that is, if you

16   have a facially sufficient initiative, but the signature

17   verification shows that some people were not registered voters

18   at the time, then you were allowed to cure or add more

19   signatures, the proponents of an initiative have 30 days to do

20   that.  And then the Arkansas Constitution says the Secretary of

21   State shall have 30 more days after that to review those

22   additional signatures, and it's going to turn out that that

23   second submission, the cure submission, is frequently more

24   substantial than the initial submission; there are more

25   signatures involved.  It is counterintuitive.  I just want to

1   make sure that we get it clearly on the record.  So you have a

2   90-day period in the Arkansas Constitution.  The problem is, of

3   course, the federal government supersedes all of that by

4   superimposing the UOCAVA deadlines, and the UOCAVA deadlines

5   indicate that in order to get the correct thing certified or not

6   certified to the ballot, the Secretary of State has to have

7   everything done by the certification deadline in August.  So

8   instead of having 30 days for the Secretary's initial review,

9   30 days for the cure period, and 30 days for the Secretary's

10  subsequent review, what you really have is something like -- and

11  I think we'll go through this -- ten days for the Secretary's

12  initial review, 30 days constitutionally allowed for the cure

13  period, and then something like six or seven days for the

14  Secretary to do its subsequent review.  It is not intuitive, it

15  is not written anywhere in the law; it is simply a fact of

16  UOCAVA compliance in making sure that the Secretary finishes its

17  review before the certification deadline.  And we can draw that,

18  if you want, to show you how it's done.  I've done the

19  back-of-the-envelope calculation long enough to know from heart

20  how it works.

21       Working back, in addition to that, there has been a change

22  in the law concerning the general primary, better known as the

23  runoff primary, number 16.  That law was changed in the 2017

24  session, before the Eighth Circuit made its decision in this

25  case, by the way.  That law was changed in the 2017 session to

1    allow an extra week between the preferential primary and the

2    general primary or runoff, because, the evidence will show, the

3    clerks simply did not have enough time to get everything done,

4    including burning of media and printing of ballots, before the

5    preferential primary -- excuse me -- before the general primary

6    began.

7         Early voting begins, in item number 15, on the 12th of July

8    this coming year, but you'll see that everything has to be

9    prepared and testing has to be done, Logic and Accuracy Testing

10   of all the machines, as required by law.  That testing can take

11   three or four days, or longer if more machines are involved.  So

12   we're going to talk about how Logic and Accuracy Testing and a

13   public test of all election machines, which is required to be

14   done for every election, adds additional time on the clerks and

15   on the Secretary who is the backup for all election machinery

16   issues.

17        Fourteen is not a consequential deadline, other than it

18   happened.

19        Thirteen, the preferential primary.  And, again, Arkansas

20   law added early voting, the two weeks of early voting before the

21   preferential primary in 1995.  We will fill in a number of other

22   deadlines that occur in there to show you how busy things can be

23   for the Secretary and the clerks.

24        The UOCAVA deadline, well established, number 11, that's

25   the deadline when Arkansas's required by law to mail out

1    military overseas votes.  What does not show on this calendar

2    and what is not well understood is the second UOCAVA deadline

3    for the general primary runoff.  That deadline is May 4th, and

4    that deadline has the exact same consequences as all the other

5    deadlines.  It's not on the calendar for this reason:  It is

6    physically impossible for the Secretary of State to meet that

7    deadline, physically impossible for the clerks to meet that

8    deadline, because it's 46 days before the runoff, and the

9    election has not even started yet.  So the Secretary of State

10   has purchased software and changed the law in the state of

11   Arkansas so that all runoff ballots for overseas citizens and

12   military voters, they receive two ballots on their application

13   for a preferential primary.  The first ballot is the May 22nd

14   primary ballot.  The second ballot assumes that every candidate

15   race, or every race that has more than three candidates, or more

16   than two candidates, assumes that that race could go to a runoff

17   and asks the overseas voters and the military voters to rank

18   their choices one, two, three, four.  We call it an

19   instant-runoff ballot.  Some people call it a ranked-choice

20   ballot.  The only people in Arkansas that receive those kind of

21   ballots are military and overseas voters.  The critical thing,

22   though, is, because there's a physical inability to comply with

23   the deadline, we train the clerks -- and remember they're using

24   the Secretary of State's system to do this -- we train the

25   clerks to treat every day from April 4th to May 4th as a UOCAVA

1    deadline, because you don't know when you're going to have a

2    military voter who doesn't qualify or didn't register on time or

3    didn't get his or her work done to get a timely vote for the

4    preferential primary and yet they are timely for the general

5    runoff primary.  It's not intuitive.  It's built into the law.

6    I'm happy to go through it with you.  I just want to make sure

7    you understand the complications that the UOCAVA and MOVE Act do

8    to the State of Arkansas and every other state.

9         The absentee ballot application deadline, again, not a huge

10   deadline other than it is when the clerks must have things ready

11   to go for absentee voters, and the Secretary helps them in that.

12        Ballot draw, a critical deadline again because that's the

13   order of the candidates on the ballot, and that is different in

14   every county.

15        Certification of the candidates, that is the deadline when

16   the Secretary and the county clerks must certify to the County

17   Boards of Election Commissioners the names that will appear on

18   the preferential primary ballot and the potential names that

19   will appear on the general runoff ballot, or the instant-runoff

20   ballot for military voters.

21        And then the filing period, which we discussed ad nauseam,

22   which is where the real issues come up.  And then some of the

23   earlier deadlines, we will discuss some of them, not in great

24   length, but at least you will know and understand, for example,

25   that independent candidate petitions, the period to gather

1    signatures started on December 1st, so approximately two weeks

2    ago, 12 days ago, and that period has begun for independent

3    candidates who intend to file as independents in the March

4    filing period.

5         With that, Your Honor, if you have any questions, I'll be

6    happy to answer, but I would like to call Mr. Bridges.

7              THE COURT:  Let me find out if Mr. Linger wants to

8    give his opening before his case in chief or now.

9              MR. LINGER:  I would probably prefer to say just a few

10   short words now.

11             THE COURT:  Okay.  Let's do that then before we get

12   into the witnesses.

13             MR. LINGER:  I think it's important, Your Honor, that

14   we focus on what is important here, as we were directed by the

15   two-judge majority of the Eighth Circuit.  And what I've just

16   listened to from Mr. Kelly I'd say is about 85 percent

17   immaterial and unimportant.  It sort of reminds me of the

18   magician who says to look up here while the action is taken over

19   here.  The Eighth Circuit was very specific about what they

20   thought was unclear in the record.

21        Judge Smith, the chief judge, who is from Arkansas,

22   thought, just from the record --

23             THE COURT:  And down the hall.

24             MR. LINGER:  -- just from the record, because he

25   talked about that he did not think that the record bore it out

1    and the burden was on them, but the other judges I think were

2    more cautious in saying we really would like this cleared up.

3    But I think certain things are very important.  I particularly

4    refer you to Judge Smith's footnote 2 where he talks about all

5    the signatures on judicial petitions that are counted in a

6    30-day period.  And as Your Honor knows, if you'll look at our

7    Exhibit 2, which is the discovery interrogatory responses by the

8    Secretary of State's office, when I asked specific questions

9    there of them --

10             THE COURT:  Which interrogatory?  I'm on Exhibit 2,

11   but --

12             MR. LINGER:  These are the answers from the Secretary

13   of State's office in plaintiff's exhibits.

14             THE COURT:  I'm just asking you, are you just

15   referring to them in general or a specific interrogatory?

16             MR. LINGER:  I'm talking about the ones that are --

17             THE COURT:  I mean, in your interrogatories, I just

18   don't know which one --

19             MR. LINGER:  I would suggest the ones that are most

20   important in that regard are the ones that begin with their

21   answers for Interrogatory No. 6 where I simply want to know

22   about how many petitions were turned in, how many independent

23   candidates, particularly statewide candidates, independent

24   petitions, when they count them, and how many signatures were

25   counted, for example, for initiative petitions, when they are

1    turned in.  Because as we know, the judicial candidates, and I

2    think even the two-judge majority of the Eighth Circuit was

3    clear that they think the judicial candidates, they're all

4    counted by February, before there's even a deadline, whether

5    it's March 1st or May 1st.  They basically -- there is no

6    conflict at all there because they're counted.  And I think Your

7    Honor, in your decision below, you noted that there had been an

8    increase.  A judge in Arkansas can simply pay a fee, but for

9    some reason there seems to be this big increase in the judges

10   that are petitioning, and those petitions are counted in --

11   almost like a hundred thousand of them are counted within a

12   30-day period, and yet when we look at the historical record,

13   there are one -- I think Judge Smith said he could only find

14   twice where there had been a statewide independent candidate

15   that had submitted petitions.  But the fact is, almost every

16   year it's usually only one, and since this new law was made in

17   2013, the 2014 election, not a single statewide petition by an

18   independent candidate in 2016, in the interrogatories here; not

19   a single statewide independent candidate.  By having it so

20   early, when people don't know who the Republicans or Democrats

21   are going to nominate, when the weather is bad, when people's

22   political interest is so low, they have completely eliminated

23   statewide independent candidates.  And in fact, as is noted in

24   the interrogatory answers, they had one, I think, state senator

25   independent candidate in 2014, one, and that was only in a state

1    senate district.

2         So this has had a severe effect.  And there is no conflict

3    with the judicial petitions because they're all counted and

4    verified before a deadline, which would be March 1st, or even

5    May 1st, or if it was at the end of May.  And then when we get

6    to the initiative petitions, whether for a constitutional

7    amendment --

8              THE COURT:  Slow down just a little bit.

9              MR. LINGER:  I'm sorry, Your Honor.

10             THE COURT:  It's just my job to put on the brakes.  Go

11   ahead.

12             MR. LINGER:  -- whether a constitutional amendment or

13   an initiative as to changing state law, that is basically around

14   the 6th to the 8th of July.  And yet once again, in looking at

15   the interrogatory answers in Plaintiff's Exhibit 2, going over

16   to the number of signatures that they have collected, you'll

17   see, like, in number 13, some years, like in 2010, they had no

18   petitions submitted, but in 2012, they had --

19             THE COURT:  Are you referencing me to Interrogatory

20   13?

21             MR. LINGER:  Their response to Interrogatory 13, yes,

22   Your Honor.

23             THE COURT:  I was over looking at the timeline.  I'm

24   sorry.

25             MR. LINGER:  I'm sorry, Your Honor.

1      THE COURT:  My fault.  I'm on the right piece of paper

2  now.  Go ahead.

3      MR. LINGER:  Plaintiff's 2, interrogatory response

4  number 13.  In 2010, there were no initiative petitions even

5  submitted; 2012, they had four submitted, over 424,000

6  signatures, which they processed.  But all these were submitted

7  and processed after they would have been able to, if we had,

8  say, the May 1st deadline, which the Eighth Circuit seemed to

9  focus on, they would have had more than two months to process

10  them.  And as we know, in 45 days or less, they process

11  approximately a hundred thousand judge petitions.  Here, they

12  have 30 days to process these and then they can be challenged,

13  or if they don't have a sufficient amount, under Arkansas law,

14  they can actually have 30 more days to gather more petition

15  signatures.

16      So these are huge numbers of petition signatures that are

17  able to process in a short period of time.  If we had the

18  May 1st deadline, they can't show that it's necessary to have it

19  on March 1st for the simple reason that two months is more than

20  enough to process a hundred thousand or so judicial signature

21  petitions, over 400,000 initiative petition signatures, and yet

22  as we know, even when the deadline was back on May 1st or when

23  it was May 29th, years ago, the most they ever seemed to have

24  ever gotten for a statewide candidate, which would be 10,000

25  signatures needed, were two, and sometimes only one.  So simply

1    there is no conflict.  And you can see in 2014, they had two

2    petition signatures of 257,000-plus; in 2016, four petition

3    signatures of 511,000.  Those are way, way above what they would

4    have to verify and process for independent candidate petitions

5    at a different time period.  There is no conflict there.

6         So, therefore, I would say -- and I actually asked that

7    question in Plaintiff's Exhibit No. 2 and No. 6, and, actually,

8    No. 5 on page 7 of it you'll see I asked them about what periods

9    of time were available and they just basically objected.  I

10   think what we have is, they're trying to avoid these questions

11   that are asked to be answered by the Eighth Circuit.  And as I

12   submitted in our proposed findings of fact and conclusions of

13   law, I set off certain conclusions that are set forth in

14   conclusions beginning around -- I mean, in findings of fact that

15   begin around number 18 through the end of it where we have

16   certain findings as to the number of candidates,

17   that independent candidates were processed, and there are very

18   few of them, even in the smaller districts, for, like, state

19   house or state senate.  So it simply is a problem and a

20   conclusion that they claim they have so much work to do and yet

21   it is very little work, there is no reason, it is not necessary.

22        And just a final word.  Counsel talked about the *Langguth*

23   case.  The *Langguth* case, which was decided in 1994, is when the

24   deadline was much later, in May.  And at that time, Your

25   Honor -- that decision is unpublished.  And under the Eighth

 1   Circuit rules, I believe it's 32.A1 [sic], those are not to be

 2   considered before 2007, unless it was res judicata or collateral

 3   estoppel or something that would have some bearing.  So I don't

 4   think that even applies, and I think it's sort of a red herring

 5   to bring that up.  But I think when the evidence is all in here,

 6   they are going to have failed to meet their burden to show why

 7   it's necessary to have a March 1st deadline for independent

 8   candidate petitions.

 9            THE COURT:  Mr. Kelly, call your witness.

10            MR. KELLY:  Josh Bridges.

11            **JOSH BRIDGES**, **DEFENDANT'S WITNESS**, **DULY SWORN**

12            MR. KELLY:  Your Honor, is it okay if I give him a

13   copy of the exhibits?

14            THE COURT:  It is for me, or it is with me.

15            MR. LINGER:  That's fine.

16                       DIRECT EXAMINATION

17   BY MR. KELLY:

18   Q.   Mr. Fincher has written on some of these, but nothing

19   material.

20   A.   Thank you.

21   Q.   Could you please state your name?

22   A.   Josh Bridges.

23   Q.   Mr. Bridges, what do you do for a living?

24   A.   I'm an election coordinator for the Secretary of State.

25   Q.   How long have you worked there?

1   A.    I've worked for the Secretary of State since February 26th

2   of 2013.

3   Q.    And how long have you been in the Elections Division?

4   A.    Since November of 2013.

5   Q.    And what have your positions been in the Elections

6   Division?

7   A.    I've served as an elections services representative.  I've

8   served as administrative rules coordinator, and I'm currently

9   serving as election coordinator.

10  Q.    In the positions that you've had, have you had a fair

11  opportunity to see how elections are run in the state of

12  Arkansas?

13  A.    Yes.

14  Q.    And have you had a chance to go over the discovery

15  materials in this case?

16  A.    Yes.

17  Q.    You're familiar with most of what we've done?

18  A.    Mostly.

19  Q.    I'm not going to ask you to memorize it, but we'll talk

20  about some of those things today.

21  A.    Okay.

22  Q.    Pull out Exhibit 1.  We'll just start with that and use

23  that as our basis to proceed.  Let's start with some of the

24  questions that are raised by Mr. Linger.

25  A.    Okay.

1  Q.   What is the Secretary of State's period to analyze

2  petitions for nonpartisan candidates, when does that begin and

3  when does that end?

4  A.   It begins 45 days -- or it begins the day the petition is

5  turned in.  The Secretary of State has 45 days to verify those

6  petitions.

7  Q.   Not 30?

8  A.   Not 30.

9  Q.   Do you remember when that law was changed and why?

10 A.   Recently.

11 Q.   Was the law changed to allow the Secretary more time to

12 process them because more signatures were coming in?

13 A.   Yes.  The amount of petitions turned in to the Secretary

14 has been trending upward.

15 Q.   And currently, unlike in 1994, currently all district court

16 judges file with the Secretary of State.  Is that right?

17 A.   Yes.

18 Q.   And currently, in addition to all of the district court

19 judges, all of the prosecutors file with the Secretary of State

20 as nonpartisan candidates.  Is that right?

21 A.   Correct.

22 Q.   Those things have been added to the Secretary's duties

23 recently?

24         MR. LINGER:  Your Honor, I'm going to object.  He has

25 been leading and suggesting answers.  I'd ask him not to lead

1    his own witness.

2           THE COURT:  I'm going to be mindful, Mr. Linger, of

3    your objection, but some of the stuff he's leading on probably

4    is uncontested.  And if it will help get us through some dates,

5    I don't know -- when he's asking a question that really isn't

6    agreed to, I'll keep him from leading.  But some of these things

7    we've already gone through and I'm pretty familiar with.  But

8    I'm going to give you the same leeway in establishing dates and

9    facts with your witnesses that are unrefutable, I should say.

10          Try not to lead your witness unless it helps me.  And I'll

11   just let you go from there.

12          MR. KELLY:  I'll try to put it into the form of a

13   yes-or-no question, if that's all right.

14          THE COURT:  When it comes to actually asking his

15   opinions or things of that nature as opposed to did this happen

16   in the past, he's going to have to fly on his own.  But as far

17   as establishing dates and what is actually the state of things,

18   I'm going to allow you to help him a little.

19          MR. KELLY:  Thank you.

20   BY MR. KELLY:

21   Q.   I would ask you for an historical perspective, but you

22   really can't give an historical perspective on behalf of the

23   aggrieved candidate in the Elections Division, can you?

24   A.   No.

25          THE COURT:  Slow down, Mr. Kelly.  That was really

1  fast.

2  BY MR. KELLY:

3  Q.    Mr. Bridges, there is an alternate method for nonpartisan

4  candidates to file during the party filing period by paying a

5  filing fee.  Is that right?

6  A.    That is correct.

7  Q.    Does the Secretary have to finish its review of all the

8  nonpartisan candidates' signatures before the filing period

9  begins?

10 A.    Yes, it is recommended.

11 Q.    You were in the office during the 2014 cycle.  Is that

12 right?

13 A.    Correct.

14 Q.    Do you recall that there was significant litigation

15 concerning the nonpartisan candidates?

16 A.    Yes.

17 Q.    We're going to talk about some of those specifically later.

18 Does the litigation concerning nonpartisan candidates, that is,

19 attempts to invalidate signatures or attempts to knock someone

20 off the ballot, do those cases, involving nonpartisan candidates

21 and others, do those cases normally arise only after the party

22 filing period ends, the party filing period?

23 A.    Yes.

24 Q.    Because that's when you know whether there's more than one

25 candidate in the race.  Is that right?

1   A.   That's correct, yes.

2   Q.   Currently, for the '18 election cycle, we're just going to

3   use current law, if that's all right.   Independent candidate

4   petitions are due on the party filing period, on March 1st?

5   A.   That is correct, currently.

6   Q.   New party candidates' Political Practices Pledges are due

7   the same day?

8   A.   Correct.

9   Q.   Write-in candidates are due the same day?

10  A.   That is correct.

11  Q.   Nonpartisan candidates' filing fee due the same day?

12  A.   Correct.

13  Q.   And now school elections with an election in May, also due

14  the same day?

15  A.   That is correct, yes.

16  Q.   And does that party filing period apply to the county

17  clerks as well?

18  A.   All 75 clerks, yes.

19  Q.   And the laws that we're talking about in this case, the

20  laws concerning the date of independent candidate petitions, do

21  they apply to the 75 county clerks as well?

22  A.   They do.

23  Q.   Does it impact the clerks as much as the Secretary of

24  State?

25  A.   As much as or possibly even more, yes.

1   Q.   On the timeline, Exhibit 1, when the party filing period

2   ends on March 1st, and then the next day -- is there a deadline

3   for the clerks and the Secretary to review the names on the

4   Political Practices Pledges?

5   A.   It is due the day after the close of filing period, yes.

6   Q.   What kind of work is involved in that?

7   A.   Ensuring that all the paperwork is properly filed and

8   ensuring that the names on the Political Practices Pledge have

9   been properly filled out for every single candidate, for every

10  single position filed.

11  Q.   Then are there a couple of other notice deadlines on

12  March 5th for nonpartisan write-ins and statements of financial

13  interest by candidates?

14  A.   Yes, there is.

15  Q.   On March 8th, the deadline to certify primary candidate

16  names to the County Boards of Election Commissioners, Item 7 on

17  the calendar, what kind of work is involved for the clerks and

18  the Secretary to meet that deadline?

19  A.   They are double-checking the spelling of names as they

20  appear on the Political Practices Pledge.  They're

21  double-checking their lists to ensure that each candidate is

22  properly showing for each race that they filed for.  So a lot of

23  proofreading.

24  Q.   And then on the scale of things, the clerks and the

25  Secretary have a lot of work to do up-front to get an election

1    done in May.

2    A.    That is correct, yes.

3    Q.    One of the other things that the clerks have to do that the

4    Secretary does not have to do is ballot draw.  On what day is

5    that?  Number 8.

6    A.    Yes.

7    Q.    March 12th?  And that ballot draw has to be done in order

8    to program the ballot so they come out correctly on the machines

9    and on printed matter.  Is that right?

10   A.    That is correct.  The ballot draw serves as determining the

11   sequence of candidates on the ballots for every single position,

12   and that is a public meeting.

13   Q.    And then on the 5th of April and the 6th of April, the 5th

14   does not appear to be publicly consequential, but it is the

15   County Boards' responsibility to produce the ballots for the

16   clerks.  In reality, who is producing what to whom?

17   A.    The majority of the county clerks' offices typically

18   perform the duties of county election commissioners, so the

19   clerks, a lot of times, are preparing the ballots, preparing the

20   media and everything involved.

21   Q.    Normally one person within the clerk's office is assigned

22   to that, or more?

23   A.    Normally, yes.  A lot of clerks have the -- I wouldn't call

24   it a luxury, but have the opportunity to have on staff an

25   election coordinator that assists and has the primary duties of,

1    you know, performing the normal duties of ballot draw, of

2    ensuring that all the deadlines are met in a timely manner.

3    Q.   And then the next day, whose duty is it to mail the UOCAVA

4    ballots or to electronically deliver them?

5    A.   The county clerk.

6    Q.   Is the Secretary of State the guarantor of the county

7    clerks as far as the federal government is concerned?

8    A.   Yes.

9    Q.   Do they call you the day after to make sure all those

10   ballots were delivered on time?

11   A.   We call them, normally.

12   Q.   And are the county clerks using the Secretary of State's

13   electronic ballot delivery system to perform their UOCAVA

14   responsibilities for voters who ask for an electronic ballot?

15   A.   That is correct, yes.

16   Q.   We looked for the ES & S, the Election Systems & Software

17   internal calendar for 2018, which was not available.

18   A.   Correct.

19   Q.   Based on your experience in previous election cycles, is

20   there an ES & S deadline that comes up mid-April concerning

21   screenshots and voice-proofing for ballots?

22   A.   Yes, that is correct.

23   Q.   And tell me what kind of work is involved in meeting that

24   deadline.

25   A.   Election Systems & Software is the vendor used by all

1    county clerks in the state of Arkansas to code the elections for

2    the state.  They provide a Web-based program that allows the

3    clerks to put in the information that is needed to code the

4    ballots.  This is the same information that requires proofing

5    for the certification of candidates.  It's the positions, it's

6    the candidates for those positions, it's the order of the

7    candidates for those positions.  Election Systems & Software has

8    certain deadlines that have to be met by the clerk in order to

9    comply with state law deadlines.

10       So there's a lot of work involved with data entry on the

11   part of the clerk.  ES & S takes the information put in by the

12   clerk and codes their ballots, their ballot styles.  In turn,

13   once those ballot styles are complete, they send those PDFs to

14   the clerk for proofing to ensure that the coding was done

15   properly.

16   Q.   And that's before they, quote, burn, unquote, media in a

17   more permanent fashion for the election itself.  Is that right?

18   A.   That is correct, yes.

19   Q.   And then another deadline that doesn't show on the

20   calendar, when is the Logic and Accuracy Testing deadline in

21   this calendar for the preferential primary election?

22   A.   The Logic and Accuracy Testing deadline is seven days prior

23   to the beginning of early voting for every election.

24   Q.   So on this timeline it would be, roughly, April 30th?

25   A.   Yes.

1   Q.    Tell us what's involved in the public -- I'm sorry --

2   what's involved in the Logic and Accuracy Testing?

3   A.    Logic and Accuracy Testing is a procedure that must be

4   performed by every clerk.  The clerk will take the media, as

5   previously mentioned, and test it on the machines.  The media

6   would basically be what's called a PEB, which is a Personal

7   Electronic Ballot.  It's a cassette tape type cartridge that is

8   inserted into the iVotronic machine, which is the stand-up booth

9   that is used for people to cast votes.  They're required to test

10  every set of media in order to determine, like the PDF proofs,

11  they're accurate; the positions, the candidates for those

12  positions, the sequence that the candidates show up, they have

13  to do this to every set of media before having their public

14  test.

15  Q.    Is it a fairly intensive time for testing to be done?

16  A.    It is.  It is very time-consuming.

17  Q.    And separately in Arkansas law, is a public test also

18  required?

19  A.    Yes.

20  Q.    Is it the Secretary of State's recommendation to do the

21  L and A test before the public test?

22  A.    We recommend for all clerks to perform their Logic and

23  Accuracy Testing to ensure that any problems that may arise are

24  caught before their public tests to where they can -- they can

25  resolve or reconcile those issues with the vendor to ensure

1    accurate elections.

2    Q.   And then a deadline that doesn't show on the calendar, is

3    there a deadline for the clerks and the county boards to appoint

4    poll workers for election day --

5    A.   Yes.

6    Q.   -- to make sure every poll is staffed?  And what day is

7    that?

8    A.   I believe it's the day before the beginning of early

9    voting.

10   Q.   No later than May 6th on this calendar?

11   A.   Okay.  Yes.

12   Q.   Amongst those deadlines, when is the preferential -- when

13   is the general primary UOCAVA day?

14   A.   I believe it was May the 4th for the runoff of the primary;

15   May 4th.

16   Q.   And in the processing of those things, is that day treated

17   as a federal deadline for all purposes?

18   A.   Yes.

19   Q.   Are all Secretary of State employees on-call 24 hours a day

20   for that deadline?

21   A.   Yes.

22   Q.   It's fairly intensive work to make sure ballots get out?

23   A.   Correct.

24   Q.   Is that something that a temporary employee could be hired

25   to do?

1   A.   No, sir.

2   Q.   On May 2nd in 2018, is there a municipal filing period that

3   opens on that day?

4   A.   Yes, the municipal filing period for city administrator

5   forms of government.

6   Q.   Now, I'm not sure it's city administrator, but we'll call

7   it municipal offices.

8   A.   Okay.

9   Q.   That's for cities that have chosen to have filing before

10  the primary.  Is that right?

11  A.   That is correct.

12  Q.   Is it a city option to do?

13  A.   Yes.

14  Q.   And the Secretary does not record whether the cities do or

15  do not have an ordinance like that?

16  A.   That is correct, we do not record that information.

17  Q.   If that's the opening of a new filing period, on May 2nd of

18  2018, if the Secretary or the county clerks had not completed

19  processing independent candidate petitions before that day,

20  would a failed independent candidate be able to meet that filing

21  deadline?

22  A.   If the petitions were turned in on March 1st, the clerk

23  would have ample opportunity to verify and determine whether or

24  not the petitions were sufficient or insufficient.  And in that

25  case, given the filing period on May 2nd, that failed

1    independent candidate could file potentially for another

2    position during that filing period.  If the deadline is on

3    May 1st, the clerk, I would assume, could not turn around that

4    petition in 24 hours.

5    Q.    And generally in Arkansas law, is there a prohibition on

6    running for more than one office at the same time?

7    A.    Yes.

8    Q.    If your petition, your independent candidate petition was

9    not processed timely, would you miss the filing deadline that

10   opens on May 2nd?

11   A.    Yes.

12   Q.    Do you know, roughly, when that closes, the two-week time

13   period?

14   A.    The day before the primary election, I believe, May 21st.

15   Q.    Early voting begins on May 7th, runs for 15 days.  Is that

16   right?

17   A.    Correct.

18   Q.    And bearer absentee ballots can be picked up on that day.

19   What does that mean?  Am I correct that absentee ballots for

20   bearers can be picked up at the clerk's office beginning on

21   May 7th?  Is that right?

22   A.    That is correct, yes.

23   Q.    What does that mean, and is that a labor-intensive process?

24   A.    Yes, it is labor-intensive.  The clerk has to give the

25   opportunity for bearers to pick up their ballots.  They have to

1   verify that this person is indeed a bearer of somebody's ballot.

2   They would do that in referencing the absentee ballot

3   application of the individual requesting the ballot.  Not only

4   would they have to verify the identity of the bearer, the bearer

5   would also have to sign what's called a bearer log, saying that

6   that individual picked up the ballots.

7   Q.    Then on May 15th there's a new law passed in the 2017

8   session concerning absentee ballots.  Do you remember about that

9   new law?

10  A.    Yes.  The deadline on May the 15th allows for the early

11  processing of absentee ballots by opening the outer envelope.

12  It allows the clerk more time to begin processing the ballots in

13  order to get votes tabulated for all voters by election night.

14  Q.    And I'm just going to go into the process just a little in

15  detail to make sure we have a good record.  You talk about outer

16  envelope.  You and I both understand for absentee ballots that

17  are mailed in, there are two envelopes.

18  A.    Correct.

19  Q.    One is the outer envelope that the post office puts its

20  mark on and adds the addresses.  The other envelope is what?

21  A.    The other envelope contains the ballot and the voter

22  statement of the voter.

23  Q.    Essentially, the ballot-secrecy envelope?

24  A.    Correct, yes.

25  Q.    The processing that begins this day then is only the outer

1  envelope.  The secrecy is maintained.  Is that right?

2  A.    That is correct, yes.

3  Q.    That opening of the outer envelope, is that an involved

4  process, checking and confirming voter registration, signatures,

5  and things like that?

6  A.    It is.  In processing the ballots by opening the outer

7  envelope, the clerk is able to give voter credit to that

8  individual by ensuring that that voter cannot vote again in the

9  election.  The information revealed by doing this process is

10  only the fact that this voter, John Smith, for example, has cast

11  an absentee ballot in the primary election.  The ballot secrecy

12  itself is still maintained.  We would not know how John Smith

13  voted.  So the processing of the inner envelopes would begin on

14  a later date.

15  Q.    And was the deadline moved from election morning to five

16  days, or whatever, six days before the election?

17  A.    It was, yes.

18  Q.    Why was it moved?

19  A.    To allow for more time to process this information, because

20  the clerk has to continually update this information in order to

21  keep voters from voting a second time.  They have to update

22  their voter registration software program to give, as mentioned

23  before, voter credit to that individual voter to where that

24  individual voter cannot come in again and vote a second time.

25  Q.    Were the clerks, or at least some of the clerks and some of

1    the County Boards of Election Commissioners, having a hard time

2    completing the processing of absentee ballots beginning on the

3    morning of election day?

4    A.    Yes.

5    Q.    And this law, has it changed for the general election as

6    well?

7    A.    Yes.

8    Q.    Has it changed for the general primary election as well?

9    A.    I believe so, yes.

10   Q.    You had talked about another filing period for city

11   administrator form of governments.  Does that filing period open

12   on May 16th in 2016?

13   A.    It does.

14   Q.    What filing period is that?

15   A.    That's the filing period for cities with a city

16   administrator form of government.  That is a period for

17   individuals to file for the August 19th primary election for

18   city administrator form of government.

19   Q.    And I'm going to ask the same question I asked before.  If

20   the clerks or if the Secretary had not finished processing

21   independent candidate petitions that were filed on the old

22   deadline, on the May 1st deadline, if the Secretary and the

23   clerks had not finished processing those independent candidates,

24   could they file during this party filing period which begins on

25   May 16th?

1    A.    They could not file --

2              MR. LINGER:  Your Honor, I would object at this time.

3    I think he's assuming a fact not in evidence and has not laid a

4    proper foundation.  He's asking a hypothetical here without

5    having the foundation and the particulars, so we object to that

6    question.

7              THE COURT:  Mr. Linger, is your problem that he's

8    assuming facts not in evidence that somebody would file for that

9    position?  I'm not sure what -- I think it's a math computation,

10   as I understand it.  We went through the May 2nd deadline,

11   assuming that you have petitions on May the 1st, and he said we

12   can't turn them around in one day.  I understand the question

13   basically to only ask if it were a May 1st deadline, could you

14   do it by the 16th.  That's how I'm hearing the question, at

15   least what I'm supposed to take from it.  Assuming facts not in

16   evidence, can you be more specific what he's assuming not in

17   evidence?

18             MR. LINGER:  I don't think he's laid enough foundation

19   to ask basically what is a hypothetical question of this

20   witness, and that's the basis of our objection.

21             THE COURT:  Fair enough.

22        So, Mr. Kelly, ask this witness questions that would

23   establish his knowledge about how long it would take to process

24   petitions before you ask him could he get it done by the 16th is

25   what I understand the objection to be.  How would he know you

1    can or cannot get it done in 15 days I think is the objection.

2              MR. LINGER:  Yes, Your Honor.  That's right, Your

3    Honor.

4              THE COURT:  Fair enough.  Let's go through that then.

5    BY MR. KELLY:

6    Q.    Let's ask the more basic question, are county clerks

7    defendants in this action?

8    A.    They are not represented here in court today, no.

9              MR. KELLY:  And, Your Honor, we did actually file a

10   motion to dismiss, which we lost the issue, but it was not

11   resolved or reviewed by the Eighth Circuit.  And the issue is,

12   that we said, that there's a failure to name the correct

13   defendants who are not here but would be bound by this decision,

14   in particular because he's asked for injunctive relief

15   apparently statewide.  Those 75 county clerks have a separate

16   and independent right to be here and yet none of them are named.

17   We did lose the motion to dismiss.  That doesn't mean that we

18   can't raise the issue again, and I intend to fully raise it.

19   The problem is, the question is, can we fully and adequately

20   respond or represent them, and I think the answer is we don't

21   have enough evidence to know how long it takes them to do the

22   independent candidate petitions that might come through.  And

23   the reality is, the Secretary has a method and manner of doing

24   things that appears to be, from the discovery responses,

25   straightforward and easy to understand.  It really isn't and

1    we're going to try to get into some of those issues.

2        The point I was trying to make with the question is,

3    assuming that the processing had not been completed, would those

4    candidates be eligible to file for that date.  The question, or

5    the objection assumes incorrectly that the law is that

6    processing is the only issue, when the *Langguth* case said that

7    is not so.  The *Langguth* case said it is the processing and, in

8    addition, it is the time that it takes to litigate a challenge

9    to those petitions, a time that is outside of the Secretary's

10   control, outside of the county clerk's control.  And I have

11   proof coming up about what kinds of problems it creates to have

12   late litigation.  We have an example of what happens now under

13   UOCAVA and MOVE, what a catastrophe that would be for the

14   candidates involved, both on the ballot and not on the ballot,

15   and for the clerks involved who might have to redo their ballots

16   and would be violating UOCAVA because they didn't get the right

17   ballot sent out to military voters on time.

18       So I understand his objection.  My difficulty with it is, I

19   think that the right defendants are not here and they have a

20   right to be here.  And your overruling our motion to dismiss on

21   that basis means that we should have the right to do the best we

22   can to represent them, but we don't have the facts about what

23   time it takes them to process independent candidate petitions.

24   And remember, they separately process all down-ballot

25   independent candidate petitions at the same time we do, and the

1    law applies equally to them.

2         THE COURT:  Okay.  With that said, I understand this

3    witness can't testify to whether or not it can or cannot be

4    done.  I'm going to allow you to ask him to assume in a

5    hypothetical situation if it wasn't done, not whether it could

6    or couldn't have been done, but if it hadn't been done, what

7    would be the result.

8         MR. KELLY:  Fair enough.

9         THE COURT:  So your objection is sustained in part and

10   overruled in part.  I think the point you're making is this

11   witness can't say whether or not it can be done, and I think

12   Mr. Kelly has acknowledged that.

13        MR. LINGER:  And any good hypothetical should be based

14   on facts that are in evidence and not just speculation.

15      So what my point was, they talk about litigation, but they

16   might tell us at each election cycle how much litigation was

17   there, something like that.

18        THE COURT:  I'm going to let him ask the question,

19   assuming that the ballots hadn't been counted, for whatever

20   reason, whether it was impossible or whether or not it just

21   hadn't been done, what would be the result for the May 16th

22   deadline.  Is that the one we're on?

23        MR. KELLY:  If I may just respond briefly so I have a

24   good record, Your Honor?

25        THE COURT:  Sure.

1          MR. KELLY:  *Crawford v. Marion County* in the United

2    States Supreme Court in 2008 said that secretaries of state and

3    state party defendants are entitled to assume things that could

4    mathematically happen without having proof of it actually

5    happening because it is critical to make sure that the state

6    provides for contingencies that the law would allow.  And it is

7    because the prophylactic enactment of law is allowed in election

8    law without proof of harm, that is the reason why certain

9    deadlines might be moved because this contingency could happen.

10   Whether it has or not is irrelevant under *Crawford v. Marion*

11   *County*.

12          THE COURT:  So you think I'm right?

13          MR. KELLY:  Yes, sir.

14          THE COURT:  Okay.  I'm going to let you continue for a

15   little while.  I have an 11 o'clock plea.  So if you'll keep

16   that in mind on finding a good stopping point.  It may be now or

17   it may be in five minutes.  I don't care.

18          MR. KELLY:  Your choice, Your Honor.  It doesn't

19   matter to me.

20          THE COURT:  I'm prepared to immediately switch gears,

21   so decide on your own how you want to spend the next, roughly,

22   five minutes, I guess.

23          MR. KELLY:  Let's have him complete the question and

24   then we'll --

25          THE COURT:  Very well.

1   BY MR. KELLY:

2   Q.   Mr. Bridges, let's come back to that and see if I can do it

3   the way the Judge has asked me to.  Do you understand if you

4   assumed the clerks or the Secretary had not completed the

5   processing and litigation of the independent candidates, would

6   those pending independent candidate petitions, would those

7   candidates be able to file during this city administrator form

8   of government filing period that begins on May the 16th?

9   A.   They would not, no.

10          THE COURT:  All right.  Gentlemen, I anticipate that

11  we're going to take about 20 minutes, roughly 20 minutes, for

12  this plea.  So to give Genie a ten-or-so-minute break, we're

13  going to reconvene at 11:30.

14          MR. LINGER:  Your Honor, do we need to clear off our

15  side of the table?

16          THE COURT:  I don't think so.  If you want to move it

17  a little bit to one corner, we can work around you.  You all can

18  hang out or see you at 11:30.

19          MR. KELLY:  Would you prefer that we go through lunch

20  to get it over with, or do you plan on taking a break?

21          THE COURT:  We can talk about that at 11:30.  If you

22  all want to get a snack between now and then to get you through

23  lunch, because that possibility may happen, it might be a good

24  idea.  It's difficult for me to answer that question unless I

25  know how much longer you all anticipate you're going to be.

1          MR. KELLY:  I have a hard time knowing how long he's

2    been here.  If he's been here about an hour, I think I've got

3    another hour, maybe an hour and a half at most.

4          THE COURT:  Then we'll probably encourage you all to

5    get a bite to eat or a snack or something, because if we have a

6    lunch, it will be brief, just enough time to give the court

7    reporter a break.  See you all in a little while.

8       (Recess from 10:55 a.m. until 11:34 a.m.)

9          THE COURT:  All right.

10   BY MR. KELLY:

11   Q.   Mr. Bridges --

12         THE COURT:  We're back on the record.  You may

13   proceed, Mr. Kelly.

14   BY MR. KELLY:

15   Q.   Mr. Bridges, we're back.  We'd gone through an earlier

16   issue.  Let me just make sure I ask that, at the beginning of

17   early voting that starts on May 7th and ends the day before the

18   preferential primary election, who is statutorily required to

19   conduct early voting?

20   A.   The county clerk.

21   Q.   And does the Secretary provide support and assistance for

22   any machine issues?

23   A.   Yes.

24   Q.   Four days before any election, including the preferential

25   primary and the general primary, there's a deadline for

1    county-to-county transfers.  Can you tell the Judge about that?

2    A.    County -- excuse me.  The county-to-county transfer

3    deadline is relating to voters who are registered in the state

4    already, who have moved from one county to another.  In order to

5    vote in the election properly, by law, that individual has to be

6    registered in the county four days prior to the election.  There

7    is a large uptick in voter registration applications, which is

8    the method of even changing your address even if you are a

9    registered voter, there is a large uptick in the amount of

10   applications at the clerk's office four days prior to the

11   election.

12   Q.    Every clerk's office, every election?

13   A.    Correct.

14   Q.    Now, on May 21, 30 days before the general runoff, is that

15   like the 30 days before any election in Arkansas, is that the

16   voter registration deadline?

17   A.    That's the voter registration deadline in order to vote in

18   the general primary for the primary runoff.

19   Q.    And when you worked in the library at the Secretary of

20   State's office, did you see those voter registration

21   applications come through?

22   A.    Unfortunately, yes, I did.

23   Q.    And can you tell us what kind of volumes we're talking

24   about on that deadline for every single election?

25   A.    There is an exorbitant amount of volume of voter

1    applications.  It normally takes every single staff member to

2    open, process, and mail out the voter registration applications

3    during those times.

4    Q.    That's just at the Secretary's office?

5    A.    Yes.  We have to immediately forward those voter

6    registration applications to each county clerk daily.

7    Q.    And then does the clerk have the obligation to input those

8    or to put those into the system electronically before the

9    deadline as well?

10   A.    Correct.

11   Q.    Is that a fairly labor-intensive process from your

12   understanding of how things work?

13   A.    Yes, it is.

14   Q.    Early voting ends on the 21st, again not a deadline in

15   Exhibit No. 1, but early voting ending also is the time

16   putatively when poll books are prepared for every election,

17   including the preferential primary or the general primary or the

18   general election.  Is that right?

19   A.    Correct.

20   Q.    Tell us about what kind of work it takes to prepare poll

21   books for every polling place in every county for every

22   election.

23   A.    The clerk's office has to input data for early voting and

24   absentee voters to ensure that the poll books for election day

25   are up to date to the day before election day.  This ensures

1   that early voters and absentee voters again are not voting twice

2   in the election.  It ensures that all voters are appearing

3   correctly in the correct precincts for election day.  The clerk

4   also has to, irregardless of the use of electronic poll books,

5   the clerk also has to print a paper poll book or paper roster as

6   a backup.

7   Q.   So every precinct in every county has to have a paper poll

8   book no matter what?

9   A.   Correct.

10  Q.   Is that a labor-intensive process as well?

11  A.   Yes.

12  Q.   Can temporary employees be hired to do that?

13  A.   No.

14  Q.   In your experience, are the people who are working voter

15  registration at the Secretary's office, are they the same people

16  who do the petition processing for independent candidates?

17  A.   They can be, yes.

18  Q.   And in the clerk's office, what's the common practice, who

19  are the people that are processing independent candidate

20  petitions for the clerks?

21  A.   Anyone on staff.  Anyone from one person to possibly the

22  entire staff.  Clerk's staff are small.  She only -- he or she

23  only has a certain number of people underneath them.  So it

24  could take the entire staff.  It just depends on the amount of

25  petitions, the size of the petitions.

1  Q.    Then on the 21st as well, is that the close of the filing

2  period for the cities or the municipalities that have agreed to

3  have their filing period before the party primary?

4  A.    Yes, it is.

5  Q.    There's a new deadline that is not apparent from the

6  calendar that comes up, this year, five days after the election,

7  it might be six days after the election, so on May 28th.  Can

8  you tell us what new deadline that is?  Is that for presentation

9  of people who didn't have an ID?

10 A.    That is the deadline for individuals who did not provide

11 their identifications when they voted to reconcile that issue.

12 This comes from the new act that requires photo identification

13 in order to vote.  Individual voters who fail to show that

14 identification have until, I believe, noon the following Monday

15 to reconcile that to have their votes counted.

16 Q.    Otherwise their provisional vote is not counted.  Is that

17 right?

18 A.    Correct.

19 Q.    A new deadline for the clerks?

20 A.    Yes.

21 Q.    Are the clerks doing most of that work because the CBECs

22 have no personnel?

23 A.    Yes.

24 Q.    And on May 31st, is that the close of the filing period for

25 a city administrator form of government?

1    A.    Yes.

2    Q.    It is not well understood how Arkansas implements the

3    UOCAVA and the MOVE Act.  In Arkansas, do military voters and

4    overseas citizens have an additional ten days after the end of

5    the election to get their votes to the clerk's office?

6    A.    They do, yes.

7    Q.    Is that date ten days after, would that be, roughly,

8    June 1st next year for the preferential primary?

9    A.    That is correct, yes.

10   Q.    For every election in Arkansas they have ten extra days to

11   get their votes in.  Is that right?

12   A.    That is correct, yes.

13   Q.    We talked a little bit about the change in the law

14   concerning when the general primary will be, and probably not

15   enough to make a good record, so I'd like to make sure we ask

16   about that.  More importantly, though, I want to focus on this

17   day, which is June 1st, and that's the deadline for

18   certification of the results of the preferential primary as

19   well.  Is that right?

20   A.    Yes.

21   Q.    Those two deadlines, receipt of absentee ballots from

22   UOCAVA and MOVE voters and the deadline to certify the election

23   results, are concurrent.  Is that right?

24   A.    That is right.

25   Q.    Is that a problem for the clerks?

1    A.    Yes.  It is labor-intensive.

2    Q.    And in addition to being labor-intensive, they're required

3    by law to get the certification to the Secretary, as well as to

4    other candidates, as well as to the outside vendor, ES & S.  Is

5    that right?

6    A.    That is correct.

7    Q.    Tell us about how that affects the setup for the runoff

8    primary.

9    A.    The certification of the results is going to directly have

10   an impact on the runoff, the possibility of a runoff, because

11   between the election day, between May 22nd and June 1st, it's

12   kind of a period that's on hold.  The clerk can't certify the

13   results because they could have outstanding UOCAVA.  They could

14   have -- even have outstanding provisional ballots that they

15   can't -- they can't certify without reconciliation.  Let's say,

16   for instance, the clerk certifies on the tenth day, the last day

17   they're able to.  The turnaround between that day and the

18   deadlines that the vendor has in place for coding of a runoff is

19   extremely tight.

20   Q.    Before an extra week was added between the preferential

21   primary and the general primary, as well as between the general

22   election and the general runoff, before that week was added,

23   were the clerks having to code their ballots before the results

24   were certified?

25   A.    Yes.

1   Q.   Was the deadline or the date of the general primary changed

2   to give the clerks more time to get their work done?

3   A.   Yes.

4   Q.   Were they having a hard time getting it done before the

5   change?

6   A.   Yes.  Even with the change, we still feel like it is a

7   tight window, even with an extra week, because not only do they

8   have to begin coding the runoff election before it's even

9   certified, they also have to, just as stated before for the

10  preferential primary, conduct Logic and Accuracy Testing and

11  ensure that every single machine is prepped, zeroed out, and

12  ready for the runoff election.

13  Q.   Was there a separate change to the date for Logic and

14  Accuracy Testing for the general runoff?

15  A.   Yes.  The clerks were granted two extra days in order to

16  have more time to conduct Logic and Accuracy Testing, and it

17  went from seven days prior to the beginning of early voting to

18  five.

19  Q.   And that's a 2017 change?

20  A.   Yes.  And that's for runoffs.

21  Q.   On June 5th -- come back to June 1st one more time.

22  There's one other deadline on June 1st, which again is not part

23  of this calendar and is not generally well known, but it is a

24  very important date for counties to know and understand.  From

25  your experience in the voter registration system, what has to

1    happen in every county on June 1st?

2    A.   Each county has to certify the number of registered voters

3    in their county in order to comply with the constitutional

4    requirement in order to base the number of petitions for certain

5    races, local option for one.

6    Q.   So let's talk about local option elections.  A local option

7    is something that the Secretary's not involved in.

8    A.   Correct.

9    Q.   It is not an initiative and referendum under the

10   Constitution; it is a statutory procedure.  Is that right?

11   A.   Correct.

12   Q.   Can a local option for a wet/dry election, could a local

13   option, an election concerning alcohol, can those kind of

14   petitions come up any time between that June 1st day and the

15   certification deadline on August 18th?

16   A.   Correct.

17   Q.   And so when they come up, what happens in the county

18   clerk's office?

19   A.   The clerk has to verify that petition within a certain

20   amount of time to determine whether or not that petition is

21   sufficient.

22   Q.   Is that a ten-day period?

23   A.   I think so, yes.  I believe so.

24   Q.   And then is there a potential cure period?

25   A.   I think so, yes.

1    Q.    Then based on the subpoenas that the office has received,

2    and in your experience with local option elections, is the

3    Secretary normally dragged into those when there's litigation?

4    A.    Yes.

5    Q.    And that's for identifying voter registration issues and

6    the like.  Is that right?

7    A.    Correct, yes.

8    Q.    And in your experience, since you've been there from 2013,

9    have you seen local option litigation, local option election

10   litigation during your time there?

11   A.    Yes.  I've seen it come up, yes.

12   Q.    Pretty much every two years?

13   A.    Uh-huh, yes, sir.

14   Q.    And by law, the local option elections must be during a

15   general election.  Is that right?

16   A.    I believe so, yes.

17   Q.    On June 5th there's a determination about city

18   administration form of government, you talked earlier about that

19   August 19th primary, is that the day it has to be decided?

20   A.    I believe so.

21   Q.    June 7th is the new deadline for L and A testing and public

22   testing for the general runoff, the primary runoff?

23   A.    Uh-huh.

24   Q.    And then June 12th, early voting begins again.  Who

25   conducts early voting?

1  A.   The county clerk.

2  Q.   Is that when early voting starts, on the 12th?

3  A.   Yes.

4  Q.   Is the county using all of its available employees to

5  conduct early voting?

6  A.   Yes.

7  Q.   Is the county hiring extra temporary employees to do that

8  as well?

9  A.   No.

10 Q.   Could they if they needed to?

11 A.   No.  Due to the fact of an extreme training curve, I do not

12 believe that the clerk could contract out to temporary workers.

13 Q.   So let's make sure that we're clear on that.  During early

14 voting, the persons who are checking people in are using a live

15 voter registration system.  Is that right?

16 A.   That is correct, yes.

17 Q.   And they have to be trained personnel?

18 A.   Yes.

19 Q.   Because they're affecting how VR is reflected live

20 everywhere else and it can't be reversed?

21 A.   Correct, yes.

22 Q.   That applies to early voting in both the preferential

23 primary and the general primary?

24 A.   Yes.

25 Q.   And then just like in the preferential primary period,

1    designated bearers and absentees, pickup begins on the 12th of

2    June as well?

3    A.    Yes.

4    Q.    The absentee request deadline by fax and mail.  Is that

5    right?

6    A.    Yes, sir.

7    Q.    And the clerks have to deliver to CBECs any absentee

8    ballots received.  Is that right?

9    A.    Correct.

10   Q.    So that the counting of the incoming absentee ballots

11   begins on the same day that they're to be received.  Is that

12   right?

13   A.    Correct, yes.

14   Q.    Time crunch-wise, is that a pretty bad time crunch for

15   clerks?

16   A.    Yes.

17   Q.    Is there another county-to-county transfer deadline on the

18   15th of June next year?

19   A.    There is, yes.

20   Q.    And then on that same day, the 15th of June, are

21   applications for absentee ballots for municipal primaries to be

22   held in August, is that the first day that you have to be able

23   to collect those absentee ballot applications?

24   A.    Yes, sir.

25   Q.    On the 18th, when early voting ends, is that when poll book

1    preparation has to begin?

2    A.    That's correct.

3    Q.    Is that going to be like an all-nighter for county clerks?

4    A.    Could be.

5    Q.    The 19th is a preferential primary -- I'm sorry -- the

6    general primary runoff?

7    A.    Yes.

8    Q.    Then on the 25th, is that the day when the clerks are to

9    receive the identification for people who fail to provide it and

10   had to vote provisional?

11   A.    Yes, sir.

12   Q.    And then the 29th of June, is that another UOCAVA day for

13   clerks who have municipal primaries?

14   A.    It is, yes.

15   Q.    Have you had extensive experience -- have you had any

16   experience with the processing of initiative and referendum

17   petitions for the Secretary?

18   A.    Yes, I have.

19   Q.    Are you the primary supervisor of how those are conducted?

20   A.    Yes, I am.

21   Q.    Have you been since 2014?

22   A.    Yes.

23   Q.    Did you have the distinct pleasure of sitting with me

24   during the litigation for two full weeks at the Arkansas Supreme

25   Court last year?

1   A.   I did, yes.

2   Q.   Let's talk a little bit about that.  I spoke to the Judge

3   earlier and I just want to make sure that we go through it and

4   get the evidence in.  And before I forget, in 2016, even though

5   the deadline was the first week of July, it might have been the

6   8th of July, in 2016, was there an initiative and referendum

7   petition presented to the Secretary before the deadline?

8   A.   Yes, sir.

9   Q.   Could that happen any time?

10  A.   Yes, sir.

11  Q.   Who presented what petition?

12  A.   Melissa Fults turned her petition in early for the Medical

13  Cannabis Act, I believe.

14  Q.   Was that the one that includes the grow-your-own-marijuana

15  provision?

16  A.   I believe so, yes.

17  Q.   Did they distinguish it from the one that doesn't?

18  A.   Correct.  There were two marijuana petitions turned in, in

19  2016.

20  Q.   And then in the normal course on the deadline for filing

21  initiative and referendum petitions, do most people file on that

22  deadline?

23  A.   Mostly, yes.

24  Q.   So you get two or three or four?

25  A.   As many as people would like to turn in, yes.

1    Q.    Let's talk a little bit about the filing process.  The
2    Constitution says there shall be a total of 90 days for review.
3    The Constitution doesn't account for the certification deadline
4    that's necessary to get the ballots printed to meet the UOCAVA
5    deadline in September.
6    A.    Correct.
7    Q.    If the Secretary is to provide 30 days to every petition,
8    that is, a cure period for every petition, and reserve enough
9    time to review the cure petition, how much time does the
10   Secretary have to do the first review?  It's a bad way to ask
11   the question because there's too many variables.  Let's do it a
12   different way.  If there's 31 days in July and the deadline is
13   the 6th, that gives us 25 days in July.  Is that right?
14   A.    Yes.
15   Q.    And if the certification deadline is the 23rd of August,
16   that gives us 23 days in August, maximum, to include that full
17   last day.  Is that right?
18         THE COURT:  You're going a little fast.  Start back
19   after the 25th of July.  You outran me, so I know you outran
20   Genie.
21   BY MR. KELLY:
22   Q.    So if there's 31 days in July and the deadline is the 6th
23   of July, does that leave 25 days in July --
24   A.    Yes.
25   Q.    -- to process petitions, if you work weekends?

1    A.    Yes.

2    Q.    And if the certification deadline is the 23rd of August and

3    we assume you work weekends, does that leave a maximum of

4    23 days in August?

5    A.    Yes.

6    Q.    So 23 and 25, I add, 48 days total for the review?

7    A.    Correct.

8    Q.    About right?

9    A.    Yes.

10   Q.    And if we take out the 30 days that the Constitution

11   requires for anyone who obtains a cure period, 48 minus 30, how

12   many days does that leave the Secretary to do both sets of

13   review?

14   A.    Eighteen.

15   Q.    That's to make sure that it gets the work done before the

16   certification deadline.  Is that right?

17   A.    Correct, yes.

18   Q.    So the Constitution says 90, actually 30, 30, 30, UOCAVA

19   says 18 total for Secretary's review?

20   A.    That is accurate, yes.

21   Q.    In your experience with the litigation and with the

22   processing of the petitions, normally are you the single most

23   important witness for the Secretary in the defense of the

24   Secretary's actions about how petitions were processed?

25   A.    I believe so, yes.

1    Q.   The litigation concerning petitions normally does not

2    happen until after the certification date.  Isn't that right?

3    A.   Correct, yes.

4    Q.   Because people won't sue unless they know it made the

5    ballot.  Is that right?

6    A.   Correct.

7    Q.   We talked about earlier that in Arkansas all these cases

8    have to be decided before election day.  Is that right?

9    A.   Yes.

10   Q.   In the supreme court we had at least three signature

11   challenges concurrently last year.  Is that right?

12   A.   That is correct, yes, sir.

13   Q.   The Secretary had those?

14   A.   Yes.

15   Q.   Those are directly filed with the Arkansas Supreme Court?

16   A.   Yes, sir.

17   Q.   A special master is appointed to hear facts?

18   A.   He is, yes.

19   Q.   And after that, are you aware that the special master does

20   some kind of report?

21   A.   Yes.  They -- he puts together a report for the supreme

22   court justices to review.

23   Q.   After that report, the parties get a chance to brief?

24   A.   Correct, yes.

25   Q.   And then there's oral argument?

1    A.    Yes.

2    Q.    And then the court decides?

3    A.    Yes, sir.

4    Q.    There's some exhibits, or a list of exhibits we can talk

5    about.  But, generally, last year we talked about some of those

6    cases; Chuck Lange, Mike Ross, Toni Rose.  Were the decisions of

7    the supreme court literally that last week of October 2016?

8    A.    If I recall correctly, they were, yes.

9              MR. KELLY:  And, Your Honor, you had a case as well

10   that came out of one of those cases, the Watson case.  I've

11   asked Mr. Linger if he would agree that you would take judicial

12   notice, not of the content of that case, but just the fact that

13   it was filed.  You heard a motion for preliminary injunction,

14   roughly, November 4th, major decision, denied it -- thank you --

15   and then the case was closed shortly after the election on

16   plaintiff's motion.  I'd just ask you to take judicial notice

17   that that litigation was also filed.  I asked Mr. Linger -- and

18   I'm sorry.  I don't recall whether you said it was okay or not.

19             MR. LINGER:  I have no objection to the Court taking

20   judicial notice of that.  I do think it's totally immaterial to

21   the issues here, but I have no objection to the judicial notice.

22             THE COURT:  Very well.  I shall do so.

23             MR. KELLY:  Do you want the case number?

24             THE COURT:  Not if you're just asking me to -- well,

25   you can read it into the record.  But if you're just asking me

1   to take judicial notice that the case was filed, processed, and

2   done.  But for completeness sake, give me the number.

3           MR. KELLY:  4:16CV809 JM.

4           THE COURT:  All right.  Thank you.

5           MR. KELLY:  Watson versus Martin.

6   BY MR. KELLY:

7   Q.   Let's talk a little bit about this notice of candidacy on

8   page 11, 12, and 13.  One copy is certified, the other is not

9   certified.

10          THE COURT:  So we're on page 11 through 13?

11          MR. KELLY:  Yes, sir.

12          THE COURT:  Okay.  I'm with you.

13  BY MR. KELLY:

14  Q.   On this notice of candidacy for independent candidate, Mr.

15  Moore's notice, is there a signature of the candidate there?

16  A.   No, there is not.

17  Q.   Is that file mark crossed out there?

18  A.   Yes.

19  Q.   In the Secretary of State's officials files, was Mr. Moore

20  filed as a candidate in 2014 for lieutenant governor?

21  A.   No.

22  Q.   Does that letter, on page 17, tell him that, 17 and 18?

23  A.   Yes, it does.

24  Q.   In 2014, were there any candidates, to your knowledge, from

25  the Secretary of State's records, were there any independent

1  candidates who attempted to petition that didn't get on, besides

2  Mr. Moore?

3  A.   I believe there was one, yes.

4  Q.   One attempted, but did he get on or not?

5  A.   I believe he did.

6  Q.   So is that Mr. Pritchett?

7  A.   Yes, George Pritchett.

8  Q.   Exhibit 21, or page 21?

9  A.   Correct, yes.

10 Q.   Any other candidates attempt to get on that year?

11 A.   Not that I recall.

12 Q.   The Secretary didn't deny anyone else access.  Is that

13 right?

14 A.   Not that I recall.

15 Q.   In 2016, were there any statewide candidates on the ballot

16 besides U.S. Senate?

17 A.   There were two independent candidates on the ballot.

18 Q.   I have a different question.  The question I have is, were

19 there any statewide offices, like lieutenant governor, secretary

20 of state, governor, land commissioner, were those offices on the

21 ballot in 2016?

22 A.   No, they were not.

23 Q.   The only statewide office on the ballot was the U.S. Senate

24 race.  Is that right?

25 A.   I believe so, yes.

1   Q.   And no one attempted to file as an independent candidate

2   for U.S. Senate in 2016, did they?

3   A.   Not that I recall.

4   Q.   You said correctly that the Secretary's files reflected at

5   least two people did make it on the ballot as independents in

6   2016?

7   A.   That's correct.

8   Q.   That's in 29 and going forward?

9   A.   Yes.

10  Q.   I'd like to talk about Johnny Weaver in 2006, if you'll

11  turn to page 50.  Have you had a chance to look at that circuit

12  court order concerning Mr. Weaver, the independent candidate

13  from 2006?

14  A.   I have.

15  Q.   Would you just summarize for the Judge what it does.

16       THE COURT:  I can read the last paragraph.

17  BY MR. KELLY:

18  Q.   It basically puts Mr. Weaver back on that ballot, is that

19  right, as an independent candidate?

20  A.   Yes.  I was refreshing my memory.  It put Mr. Weaver back

21  on the ballot as an independent candidate in Phillips County.

22  Q.   And that's a race where the Secretary's responsible for

23  certifying.  Is that right?

24  A.   Correct, yes.

25  Q.   And let's just assume that 2006 was somewhat similar to

1  2016 or 2018.  If this order comes to the Secretary after the

2  certification deadline, is that a problem for the Secretary; and

3  second question, is that a problem for the counties where that

4  candidate would be on the ballot?

5  A.   Yes, it is.  It's a problem for everyone involved,

6  including the voters.  Post certification, it's impossible to

7  put someone on the ballot.  They would have to be put on a

8  separate ballot.

9  Q.   And assuming that a separate ballot is prepared, would a

10 separate ballot be able to be timely prepared and delivered for

11 UOCAVA purposes based on a late court order like this one?

12 A.   I don't believe so.

13 Q.   Net UOCAVA violations could put the state in jeopardy of a

14 federal lawsuit.  Is that right?

15 A.   Theoretically, yes, it could.

16        MR. KELLY:  Your Honor, you have Plaintiff's Exhibit 2

17 which does summarize the numbers and things like that.  We

18 didn't make a separate exhibit with that information in it, but

19 we do have it included in what's been admitted in court already.

20        THE COURT:  Plaintiff's 2 that I have is the --

21        MR. KELLY:  Those are our responses to their discovery

22 requests.

23        THE COURT:  Correct.

24        MR. KELLY:  So I don't want to belabor it because the

25 numbers are there.  We're not disputing those numbers.

1          THE COURT:  All right.

2          MR. KELLY:  I could talk about it, and, in fact, let

3    me talk about it briefly.

4    BY MR. KELLY:

5    Q.    Mr. Bridges, the 2012 numbers actually reflect a little bit

6    better how things work out.  If you could just turn to page 59.

7    This has been admitted in court.  I just want to highlight for

8    the Judge some of the issues.  Have you got that?

9    A.    Yes.

10   Q.    And, again, this is the 2012 election cycle.  I don't want

11   to misrepresent that it's 2016.  But in the 2012 election cycle,

12   were there more signatures in the first submission or the second

13   submission for the Arkansas Medical Marijuana Act that Melissa

14   Fults submitted that year?

15   A.    Second submission.

16   Q.    In the processing of petitions, we sometimes refer to three

17   distinct phases that the Secretary conducts.  Can you just go

18   through what the validation phase, the verification phase and

19   the reconciliation phase are for him?

20   A.    Yes.  The validation phase consists of the Secretary of

21   State staff verifying that each individual page is in compliance

22   with the requirements by law.  Not only do we count the number

23   of signatures to ensure that on its face the petition is valid,

24   we also label every single page with a numbered sticker for

25   tracking purposes.  We ensure that the popular name and ballot

1    title was attached, along with several other steps.  We complete

2    the validation, or intake process as we like to call it.

3        Once that's complete, we go into the verification process.

4    The verification process consists of workers going signature by

5    signature, page by page, to verify that each individual person

6    that signed the petition is indeed a registered voter at the

7    time they signed the petition.  Once the verification process is

8    complete, we determine, number one, whether or not the sponsor

9    qualifies for a cure; number two, whether or not they need a

10   cure, or if they have met the minimal requirements on the first

11   submission; and number three, we notify the sponsor of said

12   results.

13       Before we do any kind of notification, we also reconcile

14   the petition itself to ensure that our numbers are correct.  We

15   do that by comparing the number of signatures verified in our

16   software program matches what we manually enter onto our Excel

17   spreadsheet that we use.  Once those numbers match, we consider

18   the petition reconciled, and at that point we determine whether

19   or not it is sufficient or insufficient.

20   Q.   For those three processes -- I call it "validation," you

21   called it "intake" -- can temporary employees do that process?

22   A.   They can with the proper training.

23   Q.   How much training?

24   A.   Probably a day, a normal workday full of training, laying

25   the background for what they're actually doing, laying the

1   background for what is required to pass and what their

2   responsibilities are individually.

3   Q.   Do those people have to be relatively -- do the

4   qualifications of those personnel exceed the qualifications of

5   somebody just verifying signatures?

6   A.   Yes.

7   Q.   Then for signature verification, you do hire temporary

8   employees?

9   A.   Yes.

10  Q.   You would do that for an independent candidate, if

11  necessary.  Is that right?

12  A.   If necessary, yes.

13  Q.   And if you had the budget, right?

14  A.   Correct.

15  Q.   For the reconciliation phase, can that phase be done by

16  non-SOS employees?

17  A.   No.

18  Q.   That's something only Secretary of State employees can do?

19  A.   Correct.

20  Q.   The Secretary has its own internally built software to do

21  this process.  Is that right?

22  A.   Yes.

23  Q.   Which has changed significantly since 2012.  Is that right?

24  A.   I believe so, yes.

25  Q.   And is that something that the county clerks do not have

1  access to?

2  A.   They do not have access to our independent software

3  program, no.

4  Q.   They have to rely on the counting program that's built into

5  the voter registration software.  Is that right?

6  A.   Correct.

7  Q.   And the law says that the Secretary can subcontract out to

8  the county clerks the review of the Secretary's petition

9  signatures.  Does that actually happen in practice?

10  A.   Absolutely not.

11  Q.   Why not?

12  A.   The clerks are extremely busy with other duties that may

13  have nothing to do with the election process.  It would be

14  unduly burdensome on the part of the clerk to assist us with

15  something of that nature.  And number two, honestly, it would

16  just be a complete mess if we were to shuffle out petition pages

17  to various clerks across the state, hoping that they come back

18  in one piece, hoping that they come back correct.

19  Q.   And Mr. Bridges, you're young enough that, unfortunately,

20  you may not remember -- and I don't mean to berate you, but I

21  just want to focus your attention on this fact.  These kinds of

22  things, that is, preexisting law that might have been

23  applicable, changed once the federal government mandated in an

24  unfunded mandate that voter registration be concentrated in a

25  single state office in every state of the country in 2002.  Is

1    that right?

2              MR. LINGER:  Your Honor, I'm going to object.  Not

3    only is it leading and suggestive, but he's now testifying and

4    putting something in that this witness knows nothing about.  I

5    think it is going too far.

6              THE COURT:  Sustained.

7              MR. KELLY:  I'll ask it another way.

8    BY MR. KELLY:

9    Q.   The voter registration currently, is the Secretary the

10   primary repository for the data that's input by the clerks?

11   A.   Yes.

12   Q.   Has it always been that way?

13   A.   In my time, yeah.  Yes, sir, it has.

14   Q.   Do you know what HAVA is?  Do you remember the HAVA law?

15   A.   I was in high school when HAVA was implemented, but I have

16   heard stories.  I'm vaguely --

17             THE COURT:  H-A-V-A, what is that?

18             MR. KELLY:  H-A-V-A, the Help America Vote Act, which

19   came about after the 2001 election in the litigation involving

20   the State of Florida and the presidential electors.

21   BY MR. KELLY:

22   Q.   Is that right?

23   A.   Yes.  The HAVA act implemented electronic voting equipment

24   nationwide.

25   Q.   On that SOS Exhibit, page 59, concerning 2012, is it fairly

1    typical for the second submission by an initiative and

2    referendum, I and R, by an I and R group, is it frequently the

3    case that the second submission will be more numerous than the

4    first?

5    A.    It can be, yes.

6    Q.    Did that happen with the other marijuana petition in 2016?

7    A.    Yes, it did.

8    Q.    Were you involved -- or are you aware of some of the

9    changes that have been made to election law at least in the 2017

10   session?

11   A.    Yes.

12   Q.    If you'll flip to page 125.  There was a change in the law

13   concerning unopposed candidates.  Can you tell us why that law

14   for --

15              THE COURT:  We're on 125?

16              MR. KELLY:  Yes, sir.

17              THE COURT:  Got it.  Thank you.

18   BY MR. KELLY:

19   Q.    Can you tell us from your knowledge why that law --

20              MR. LINGER:  If I could ask?  125 that I have is a

21   certification.

22              MR. KELLY:  So the act is behind it.

23              MR. LINGER:  Behind it?  Thank you.

24              MR. KELLY:  Sure.  126.

25              THE WITNESS:  Act 730 of 2017 changed the law for

1  unopposed candidates to where they're not required to appear on

2  the ballot.

3  BY MR. KELLY:

4  Q.   And what was the experience from 2016 that might have made

5  that necessary?

6          MR. LINGER:  Objection.  Asking the witness to

7  speculate.

8          MR. KELLY:  Let me ask it a different way.

9  BY MR. KELLY:

10  Q.   Were there problems in the 2016 election cycle?

11  A.   Yes.

12  Q.   What were the problems?  With the new voting equipment,

13  what were the problems?

14  A.   The ballots were very long, and in order to complete and

15  cast your ballot, you'd have to scroll through every screen that

16  appears on the touch screen, whether it's the old equipment or

17  the new equipment.  The list of unopposed candidates not only

18  can be lengthy, but also ballot initiatives are lengthy, and

19  that holds up the lines to where voters have to wait longer,

20  potentially.

21  Q.   Were there lines at the polls in 2016 in the counties that

22  had new election equipment?

23  A.   Yes, there were.

24  Q.   Is this law one of many attempts to ameliorate that

25  problem?

1    A.    Yes.

2    Q.    And I can't remember whether we discussed whether it does

3    or not.  It takes unopposed candidates off the ballot?

4    A.    It takes unopposed candidates off the ballot and assumes

5    that they are duly elected at that point.

6    Q.    Coming down to page 133, what does Act 1088 do?

7    A.    I believe this law extended the time between a primary

8    election to the runoff, if I'm not mistaken.

9    Q.    That one we talked about why the 2018 election has an extra

10   week added?

11   A.    Yes.  And the subsequent general election and its

12   corresponding runoff as well.

13   Q.    What does the next one, Act 1104 on page 137, do?

14   A.    It allows for an extra week for the general election --

15   between the election and the corresponding runoff.  I apologize.

16   Q.    Yes.  Then we talked a little bit about this, but let's

17   just make sure we talk about the act.  What does Act 164 on

18   page 142 do?

19   A.    It changes the deadline for the conduction of Logic and

20   Accuracy Testing from seven days prior to five days prior to the

21   beginning of voting.

22   Q.    Just for that one election, the general primary runoff?

23   A.    Yes, that is correct.  It gives the clerk two additional

24   days to perform L and A testing.

25   Q.    Page 145 is a 2015 bill.  It would have been in effect for

1    the 2016 election cycle.  It concerns and prescribes what

2    independent candidates have to do, especially about an

3    affidavit.

4    A.    Yes, that is correct.

5    Q.    Is that something the Secretary's implemented already?

6    A.    Yes.

7    Q.    And part of that law, does it say that the candidate must

8    verify that signatures were collected within a certain 90-day

9    period?

10   A.    It does, yes.

11   Q.    And we talked a little bit about this, and I just want to

12   make sure I have evidence and not just my testimony and my

13   statements.  The independent candidates' petition-gathering

14   period has already opened.  Is that correct?

15   A.    Yes, as of December the 1st of this year.

16   Q.    So potentially there are independent candidates out there

17   gathering signatures even today.  Is that right?

18   A.    There is a possibility of that, yes.  If I may add to that?

19   We actually just had, not only in our library, but me

20   personally, we have had people call to ask when the beginning of

21   collecting signatures can begin.  So we do know that there are

22   people out there inquiring about the deadline, or begin date of

23   December 1, to gather signatures.

24   Q.    And that date applies, up and down the ballot, all the way

25   down so all the people who file with the county clerks have the

1    same deadlines.  Is that right?

2    A.    That is correct, yes.

3    Q.    And 148 happens to be the act at issue in this case.  I'm

4    not going to ask you -- I'll not say anything more about it.  It

5    is there for the Judge to now interpret and for the record to be

6    complete.

7    A.    Okay.

8    Q.    Act 110 of 2013 --

9    A.    Are you referring to Act 1110?

10   Q.    Yes.  Did I say it wrong?  1110.

11   A.    There you go.

12   Q.    What does that do?

13   A.    This consolidates the prosecuting attorney's office to a

14   nonpartisan office as opposed to a partisan office.

15   Q.    And those are then filed with the Secretary in the

16   nonpartisan filing period.  Is that right?

17   A.    That is correct, they're filed with us.

18          MR. KELLY:  Your Honor, this has been admitted with

19   the exhibit beginning at 165 --

20          THE COURT:  Let me just take you down a rabbit hole

21   right now.  So what we just talked about, from now on the

22   Attorney General is not a Republican or Democrat but a

23   nonpartisan --

24          MR. KELLY:  Just the prosecuting attorneys.

25          THE COURT:  Oh, okay.  That's why I was surprised.

1   Okay.  I knew that prosecuting attorneys had become that, but it

2   was going to be a big surprise to me if the Attorney General was

3   willing to give up her Republican status.  Go ahead.  Thank you.

4   I'm sorry.

5           MR. KELLY:  Not that I know of.

6           THE COURT:  Got it.  I'm with you.  I just misread or

7   misheard.  Go ahead.

8   BY MR. KELLY:

9   Q.   We had spoken earlier, and in the motion for summary

10  judgment, we talked about this Act 1185 of 2011 which moved all

11  the other election deadlines.  I included it for purposes of

12  completeness of the record as well.

13      I do want to talk about Act 187.  It's a certified copy

14  from our office.

15          THE COURT:  You're talking about Act 591, which is at

16  187?

17          MR. KELLY:  Yes, sir.

18          THE COURT:  Got it.

19          MR. KELLY:  And Act 591 at page 187, yes, sir.  Excuse

20  me.  I got that wrong.  This is the act that was at issue in the

21  *Langguth* case.  And this act, contrary to what Mr. Linger said,

22  this is the act that moved the deadline initially to May 1st for

23  independent candidate petitions, and it speaks for itself.  It's

24  been admitted.  I only ask that you understand that this is the

25  act that was reviewed in *Langguth*, and that was the deadline in

1    *Langguth* as well.

2    BY MR. KELLY:

3    Q.    In the discovery materials we have reviewed, do you recall

4    the litigation concerning nonpartisan candidates in 2014?

5    A.    Yes.

6    Q.    My recollection is there were five cases; there may have

7    been four, there may have been six.  Do you recall when the

8    supreme court made its decisions concerning those cases as a

9    general matter?

10   A.    I want to say it was between a month or a month and a half

11   later, possibly.  There was a large amount of time that had

12   passed before the supreme court had made their rulings.

13   Q.    Most of the time, though, the rulings came about before

14   election day on the preferential primary date.  Is that right?

15   A.    That is correct, yes.

16   Q.    Because that's the general election date for those

17   nonpartisan candidates.  Is that right?

18   A.    Yes.

19   Q.    And that litigation took place in circuit court for trial.

20   Is that right?

21   A.    If I recall correctly, it did, yes.

22   Q.    And then there were appeals in virtually every single case.

23   Is that right?

24   A.    There were.

25   Q.    In each of those cases, the nonpartisan litigation

1   involving the Secretary of State, were those binary candidate

2   cases that only one or two candidates were affected by the

3   result?

4           MR. LINGER:  I am going to object to the form of the

5   question.  I'd like it broken up and to address each case rather

6   than asking a general question, particularly with a suggestion

7   in the question.

8           THE COURT:  Well, I guess for my purposes, how many

9   cases were there?

10          THE WITNESS:  Between four and five, I would guess.

11          MR. KELLY:  One case was litigated twice, so --

12          THE WITNESS:  I may be counting one twice.

13          MR. LINGER:  Pardon my objection.  He said, "Four or

14  five cases, I guess."  I mean, we need to be more specific.

15  That's why I objected to the form of the question the way it was

16  asked.

17          MR. KELLY:  Your Honor, I have some of the documents

18  to refresh his recollection.  Would that be a more appropriate

19  method for doing it?

20          THE COURT:  You're objecting to his question or mine?

21  I mean, I simply just asked how many there were, so I was going

22  to find out how much of a breakdown we were getting, and he can

23  only break down those which he recalls, and then we'll have that

24  number four or five --

25          MR. LINGER:  He was expanding on your question because

1    he said, "Four or five, I guess."

2              THE COURT:  I understand that.  And he can only tell

3    us the breakdown on the cases he's aware of and then we can

4    count in retrospect how many cases he can give testimony on.

5              MR. KELLY:  I'll ask the question a different way.

6    BY MR. KELLY:

7    Q.    In the 2014 election cycle, during the preferential primary

8    and the general nonpartisan election, which were on the same

9    day, were you involved in the election night reporting of the

10   results from those elections?

11   A.    Yes.

12   Q.    That was part of your duties at the time, right?

13   A.    That's correct.

14   Q.    Based on your recollection, were there any runoff

15   candidates from the judicial races in the 2014 cycle?

16   A.    Not that I recall.

17   Q.    To the best of your knowledge, did any of the litigated

18   cases create election night reporting problems when the

19   candidates' vote totals had to be suppressed?

20   A.    Absolutely.

21   Q.    Tell us about that.

22   A.    As has probably already been stated today, if a candidate

23   is thrown off, quote/unquote, the ballot after certification,

24   it's too late to physically remove that name off of the ballot

25   due to, number one, UOCAVA compliance; number two, absentee

1    voters within the state that may have already received a ballot;

2    number three, the coding of the media and the printing of the

3    paper ballots.  In order to comply with the court ruling, we

4    would have to code the election night reporting website to hide

5    those individual candidates.  We, nor the county clerks, were

6    allowed to tabulate results for those individual candidates.

7    Q.    And so in your experience in 2014, for each of those

8    election night reporting issues, did you have to suppress the

9    vote totals for more than one candidate per race?

10   A.    I do not recall one way or the other.

11   Q.    Fair enough.

12            MR. KELLY:  That's all I have.  Thank you.

13            THE COURT:  Mr. Linger?

14            MR. LINGER:  Thank you, Your Honor.

15            THE COURT:  I want to take this opportunity to ask a

16   question that I need to make sure I don't forget at the end, and

17   I don't want to send any message by the timing of it.

18       But when do you all need a decision from me on this case?

19   Because I need to make sure I ask that question before you all

20   get out of here.  And I'm not saying I've already decided and

21   that I'm figuring out how long I have.  I just wrote this down,

22   "Ask this," and half the time I forget to read my own notes.

23            MR. LINGER:  I think because we are asking for a

24   declaratory decision on this, Your Honor, I think, perhaps like

25   in the previous decision, what I would hope that after a

1    decision, the legislature would take corrective action, and if

2    they do that and were to set a deadline of May 1st, say, with

3    the 90 days, that would give the months of February, March, and

4    April for people to petition, the independent candidates.  Of

5    course, you could rule the other way also, which would not be as

6    important.  But I'm just saying I think a decision sometime in

7    the month of December would be totally adequate, even up to

8    January 1st.  I don't think there would be a problem there one

9    way or the other.

10            THE COURT:  You mean sometime in the next two weeks?

11            MR. LINGER:  Well --

12            THE COURT:  Kind of like when you're in the middle of

13   December, "We don't need that until next year."

14            MR. LINGER:  January 2nd, maybe, something like that.

15            THE COURT:  Fair enough.

16       Mr. Linger -- are you through, Mr. Kelly?

17            MR. KELLY:  I don't want to make my closing argument,

18   but we would have some disagreement about the extent of the

19   ruling, who it applies to.  And I'm actually surprised to hear

20   that he only wants declaratory relief, because all the other

21   materials said he wanted injunctive relief.  So we could be

22   agreeing on something, but I just don't know about it yet.

23            THE COURT:  All right.

24            MR. KELLY:  What I would ask, Your Honor, is the

25   Secretary has a duty to take care of business that the

1    legislature gave us to do.  And so I respectfully disagree with

2    Mr. Linger on the legislature's ability to consider something in

3    the fiscal session next year, which is not permitted, generally,

4    as a matter of course, when the remedy normally would come in

5    2019 during the general session.

6              THE COURT:  You may be taking it a step beyond what

7    are the consequences of my ruling, which is a whole different

8    burden as to what I'm talking about, how quickly a turnaround

9    you're looking for, and it was as simple as that.  And I

10   understand that I may be kicking over a pile of dominoes, but --

11             MR. KELLY:  On the one hand, we're in no great rush.

12   However, if it goes against us, we're in a huge rush.

13             THE COURT:  I understand.

14             MR. LINGER:  Just two points on that, Your Honor.  I

15   understand that in the fiscal year, the legislature, in a

16   supermajority, can consider it.  Secondly, of course, the Court

17   would, in an order, actually allow, as injunctive relief --

18             THE COURT:  And that's well beyond my question about

19   how fast you all want this.  Thank you for expanding on it,

20   though.

21                        CROSS-EXAMINATION

22   BY MR. LINGER:

23   Q.   Mr. Bridges, in preparation for me asking you questions, I

24   have provided you with two exhibits, Plaintiff's Exhibits 1 and

25   2, for you to review and look over.

Bridges - Cross

1    A.    Correct.

2    Q.    And you had indicated to me earlier today, had you not,

3    before we even started trial, that you had reviewed Plaintiff's

4    Exhibit 2, which are the discovery responses by the Secretary of

5    State's office?

6    A.    I've looked them over, yes.

7    Q.    And you're familiar with the facts in them, are you not?

8    A.    Yes.

9    Q.    All right.  Well, first what I wanted to ask you is, we've

10   been talking about three types of petition signatures; one, of

11   course, is for the judicial candidates, and now, in the future,

12   the prosecuting attorneys that are no longer partisan; and then

13   we have petition signatures for independent candidates to get on

14   the ballot; and then we have petition signatures for initiative

15   petitions where there's change of state law or the constitution.

16          Is it correct you're familiar with all three types of

17   petition signatures?

18   A.    Yes.

19   Q.    My question for you, is there a difference on how they are

20   verified and checked?  That is, if I'm a judicial candidate and

21   I submit petition signatures, if I'm an independent candidate, I

22   submit petition signatures, or if I've got an initiative

23   petition to change state law or the constitution, do you check

24   them differently?

25   A.    There are different requirements for a candidate petition

1    compared to an initiative petition.

2    Q.    For example, the judicial candidates who present petitions,

3    say we get somebody here who wants to run for that and they get

4    everybody in this room who's eligible to sign the petition, or

5    maybe they get me to sign it and I'm not eligible to sign it,

6    how do you check those judicial petitions?

7    A.    We verify that each individual person that has signed the

8    petition is indeed a registered voter the time -- at the time

9    they signed the petition.

10   Q.    Okay.  And that's it?

11   A.    I feel like you're oversimplifying it, but, yes.

12   Q.    I'm just wondering, you know, if, say, I signed the

13   petition, you go and you wouldn't be able to find my name as a

14   registered Arkansas voter, would you?

15   A.    We would verify your name, yes.

16   Q.    And how long would it take you to discover that I wasn't an

17   Arkansas voter, that I signed a petition that I shouldn't have

18   signed?

19   A.    That depends on how much information you provide on the

20   petition page.

21   Q.    Well, I mean, I sign my name and then I make up an address

22   in Arkansas, so, you know, I say I live in Little Rock, 123 Main

23   Street, or something, and you don't find anything, right?  That

24   doesn't take very long, does it?

25   A.    No, sir, but we would continue to search for you by your

1    name and date of birth, if provided.

2    Q.    Now, if we had legitimate signatures, like the individuals

3    in this room who are actually Arkansas registered voters, you

4    would check quickly, because they would give a name and a

5    signature, you'd quickly be able determine that they were

6    registered voters and that the signature is valid?

7    A.    There is a factor here that we're not considering.

8    Q.    Please answer the question I asked you, sir.  The

9    individuals here in this room who are Arkansas voters, if they

10   signed a petition, you'd be able to determine that they were

11   registered voters, wouldn't you?

12   A.    Yes.

13   Q.    And who actually does that work for your office?

14   A.    It depends on the type of petition.

15   Q.    Well, I just told you it was a judicial petition.

16   A.    Okay.  That would be SOS staff, normally.

17   Q.    SOS staff.  And how many SOS staff are there?

18   A.    There are approximately 12 people on staff.

19   Q.    And they would do that.  Now, let's next go to the

20   independent.  Say we have an independent candidate like Mr.

21   Moore, he wants to petition, say, to run for lieutenant governor

22   or for U.S. senator or something that's a statewide office,

23   which is the issue in this case, do the same people that are on

24   y'all's staff that verify the judicial petitions also verify

25   that type of petition?

1   A.   Theoretically, yes, it would be SOS staff.  But I would

2   like to clarify my point.

3   Q.   Theoretically -- I'm just asking you a simple question.  Is

4   there anybody else besides that staff that would verify the

5   judicial petitions that would verify the independent candidate

6   petition?

7   A.   There are temporary workers that are contracted for

8   verifying judicial petitions.

9   Q.   Okay.  Now we're talking about independent petitions.  And

10  you do get temporary workers to help you on that.

11  A.   For judicial petitions, and that's the point that I wanted

12  to clarify.

13  Q.   Okay.  That's the question I do want to ask you.  So it

14  is -- because this was one of the questions the Eighth Circuit,

15  in fact, the fifth question about the feasibility of getting

16  temporary workers.  And, in fact, because you may have something

17  like 90 or a hundred thousand or more petition signatures from

18  various judicial candidates, you all actually have checked the

19  feasibility and have hired temporary workers to verify those

20  petitions for judicial candidates, haven't you?

21  A.   Yes.

22  Q.   All right.  And would you tell us how many temporary

23  workers you were able to hire?

24  A.   That's relative.

25  Q.   Well, tell us, in 2014, that's where we have evidence in

1    this case, I think in the decision, I think it's in the footnote

2    number 2, or, actually, it's number 11, Judge Smith says that

3    there were up to 70,000 -- no, that's the initiative things

4    there.  I think he said that you all had done, what was it,

5    almost a hundred thousand signatures in 2014?

6    A.   I would defer to the evidence on that.  I do not recall how

7    many there were.

8    Q.   Okay.  So how many workers did you have to hire in 2014

9    temporarily to do the judicial petitions?

10   A.   I do not recall.

11   Q.   All right.  Was it more than 12 people or so you have on

12   your regular staff that look at petitions?

13   A.   I do not recall.

14   Q.   Okay.  Now, how about we now talk about initiative

15   petitions, say this medical marijuana or some other petition,

16   either to change the law or the constitution.  What has to be on

17   that petition?  Just a signature with an address?

18   A.   The popular name and ballot title has to be attached to

19   every single petition part, if that's what you're referring to.

20   Q.   The petition has to be in proper form?

21   A.   Correct, yes.

22   Q.   That's sort of easy to figure out, isn't it?  You sort of

23   look at that petition, and if the petition isn't right in its

24   form, it gets thrown out right away.

25   A.   Yes, but that depends on the length of the popular name and

1   ballot title as well, because the full text of the measure has

2   to be attached.  So we review and skim through to ensure that

3   the full text is attached to every part.

4   Q.   Well, I mean, it's about three or four pages.  I mean, it's

5   not like *War and Peace* or anything.

6   A.   You should have seen the petitions we had in 2016, because

7   they were about 11 pages --

8   Q.   Eleven pages, okay.

9   A.   -- for one petition part.

10  Q.   That didn't take too long to determine, did it?

11  A.   I believe it did.

12  Q.   All right.  And then people who support that initiative

13  petition, they sign their name and put in an address so you all

14  can check if they're registered voters, correct?

15  A.   Correct.

16  Q.   And so would you say that's approximately the same amount

17  of time and work that is required for an independent petition

18  signature or for a judicial candidate petition signature?

19  A.   To verify the names?  I would say so, yes.

20  Q.   It is the same process, isn't it?

21  A.   Now, I want to clarify here.  The intake or validation

22  portion is not the same process for independent candidates or

23  judicial candidates.  Validation, yes, if we're talking line by

24  line, signature by signature.  Obviously -- and I believe Judge

25  Moody knows that the requirements are much different as far as

1    the volume of signatures.

2    Q.    Oh, yes, of course.

3    A.    Along with the prima facie requirement of an initial

4    petition.

5    Q.    If we had an independent candidate petition for state house

6    in Arkansas, that only might have several hundred signatures on

7    it to verify, right?

8    A.    Sure.

9    Q.    And then a statewide independent would have to have at

10   least 10,000 valid signatures, right?

11   A.    That is correct, yes.

12   Q.    But how about judicial candidates, how many signatures

13   would they need?  They're district --

14   A.    That's relative to the district.

15   Q.    Unless it's the state supreme court or something like that.

16   A.    Correct.  It's relative to the district and position.  So

17   it can vary from one to another.

18   Q.    All right.  In fact, last election, besides the U.S.

19   Senate, there was a statewide state supreme court, wasn't there,

20   the chief judge was on the ballot?  Wasn't that up?

21   A.    I believe so, yes.

22   Q.    So that was another statewide office that was on the

23   ballot?

24   A.    If I recall correctly, yes.

25   Q.    Okay.  But the one that is really, you might say, the

1    statewide independent candidate requires more signatures than

2    just a state senator or state representative, right?

3    A.    If you're comparing an independent candidate for state

4    representative compared to an independent candidate for

5    governor, yes, the requirements are different.

6    Q.    And a judicial candidate, if it was just a district or

7    county judge or something like that, that would be less than a

8    statewide judge, for example, like supreme court?

9    A.    I believe so, yes.  Again, that's relative and depends on

10   the district --

11   Q.    Right.  But what is the biggest requirement are the

12   initiative petitions, they require a lot more.  Isn't that

13   correct?

14   A.    Yes.

15   Q.    If you'll look at Plaintiff's Exhibit No. 1, I think I

16   called your attention before to the three footnotes there.  I

17   just wanted to know if you agree, as to footnote number 2 about

18   the 2016 amendment, that the signatures required are different

19   if it's an initiative act or a referendum.  Is that correct?

20          THE WITNESS:  Before I answer this, are we allowed to

21   speak on the footnotes, Judge?

22          THE COURT:  You can.  I think he asked you to read

23   that and basically say is it true or not.

24          THE WITNESS:  Okay.  It is true, yes.

25          THE COURT:  It is not admitted into evidence, per se.

1          THE WITNESS:  That's what I was afraid of.

2          THE COURT:  But you can speak to it.  It can be

3    through your testimony.

4    BY MR. LINGER:

5    Q.   You said number 2 is true?

6    A.   The --

7          THE COURT:  Right now we're just talking about the

8    first line of 2, before we get ahead of ourselves.

9    BY MR. LINGER:

10   Q.   I'm jumping ahead a little.

11   A.   Yes.  The first sentence on footnote number 2 is true,

12   those are the requirements for initiative petitions.

13   Q.   And in regard to the second line of the footnote 2 where it

14   says, "Therefore in order to fulfill the constitutional duty,

15   the Secretary of State must" --

16         THE COURT:  Slow down, Mr. Linger.

17         MR. LINGER:  I'm sorry, Your Honor.

18         THE COURT:  Go ahead.

19   BY MR. LINGER:

20   Q.   You see the second sentence there, don't you, that you have

21   to have the constitutional duty, in the Secretary of State's

22   office, the capacity to certify measures which require you to

23   validate at least 84,859 signatures in the six weeks between

24   July 8th and August 25th?

25   A.   That is correct, I believe, yes.

1    Q.    And then the next line after that, and they are supposed to

2    have them validated within 30 days.  Isn't that correct?

3    A.    If we're talking on the first submission of an initiative

4    petition, then, yes, 30 days is our deadline.

5    Q.    Then the next sentence, "If one of each type petition were

6    turned in, they would require the capacity to validate over

7    200,000 signatures in that amount of time."  Do you see that?

8    A.    Yes.

9    Q.    And that is correct also?

10   A.    That is correct.

11   Q.    And the final sentence, see if you agree:  "This dwarfs any

12   reasonable estimate of how many signatures they might have to

13   process for independents."  Do you agree with that?

14   A.    I don't understand that sentence.

15   Q.    Well, if I could ask you, that's far more signatures than

16   you would have ever had to verify for any independent candidate

17   petition?

18   A.    Sure, absolutely.

19   Q.    All right.  Now, therefore, you had said, when you did the

20   judicial petitions, you sometimes had looked at the feasibility

21   of hiring temporary workers to help you all out on them.  And my

22   question now is, as to the initiative petitions, have you

23   sometime had to hire temporary workers to help you out there?

24   A.    Yes, sir.

25   Q.    Okay.  And would you say, from your experience in the

1  office, you've hired more, less, or about the same temporary

2  workers to help you out on initiative petitions as opposed to

3  helping you out on judicial petitions?

4  A.    I believe that is relative because you cannot -- I can't

5  fully answer that question because we could have, let's say, a

6  hundred candidates, judicial candidates turn in petitions.  We

7  have 100 petitions that we have to verify.  Comparing that to

8  how many petitions we get in on the initiative, I can't compare

9  those two because that number can change.  It's relative.  I

10 don't know how many judicial petitions we're going to get.  I

11 don't know how many initiative petitions we're going to get in

12 any given election cycle.

13 Q.    Well, based on the answers to the interrogatories, which

14 are Plaintiff's Exhibit 2, I noticed that in some years there

15 were no initiative petitions at all.  Isn't that correct?

16 A.    Sure, I believe so.

17 Q.    And in some years you had to verify over 400,000 signatures

18 or more.

19 A.    Yes, sir.

20 Q.    But the judicial tends to be usually 90 or a hundred

21 thousand, or something like that.  Would that be correct,

22 approximately?

23 A.    I believe you're speaking in terms of individual signatures

24 turned in, correct --

25 Q.    Yes.

1    A.    -- when you speak of 90 to a hundred thousand signatures?

2    Q.    Yes.

3    A.    That I do not know.  In my head, the way I process how many

4    petitions we get in, I count candidates, the 90 to a hundred

5    thousand candidate petitions --

6    Q.    Okay.

7    A.    -- because each individual petition is relative to the

8    number of signatures required.  It depends on the position.  It

9    depends on the district.  So my way, in my line of thinking, is

10   candidate-based, while yours may be signature-based.  So I can't

11   fully answer that question.

12   Q.    Let me put it this way, because what I'm trying to get at

13   is the last question the Eighth Circuit sent down about the

14   feasibility of hiring workers.  You've already talked about you

15   looked at the feasibility of hiring extra workers to work with

16   the judicial candidate petitions.  I'm just asking you, isn't it

17   a fact that in the last couple of elections there have been a

18   lot more petition signatures that had to be verified for

19   initiative petitions than for judicial candidates?  Isn't that

20   true?

21   A.    Yes, sir.

22   Q.    Now, I would assume, tell me if I'm wrong, that therefore

23   you would have hired more temporary workers to assist you all on

24   the initiative petitions than you did when you were having them

25   help you with the judicial petitions.

1    A.    Mathematically, yes, that would be correct, yes.

2    Q.    Okay.  So in other words, in both those instances, the

3    Secretary of State's office has made the arrangements, the

4    planning, and followed through in hiring additional temporary

5    workers to help you all validate these petition signatures?

6    A.    Yes.

7    Q.    Now, you said, if I understand you correctly, and tell me

8    if I'm wrong, but, basically, validating these petition

9    signatures where the registered voters can sign them at the time

10   is basically the same for judicial petitions, independent

11   petitions, or initiative petitions.  So with that background, my

12   question is, if you had to hire additional temporary workers to

13   help you to verify independent petitions, would they be of the

14   same quality of people?

15             THE COURT:  Give him some water, please.

16             MR. ROSENZWEIG:  Okay.

17             THE COURT:  That's why I was trying to get his

18   attention.  You were rolling and I didn't want to --

19             MR. LINGER:  I think both Mr. Kelly and Mr. Rosenzweig

20   can verify that in September, when I was up at the Eighth

21   Circuit on the Libertarian case, I had to deliver the whole

22   thing with laryngitis.  It was terrible.

23             THE COURT:  I'm sorry.  We'll try to keep you out of

24   that.

25             MR. LINGER:  Thank you, Your Honor.

1    BY MR. LINGER:

2    Q.   What I'm saying is, when you're hiring the temporary

3    workers, you want people who are honest and competent, right?

4    A.   That is correct, yes.

5    Q.   Would you agree with me that whether you're hiring those

6    temporary workers to validate and verify judicial petitions,

7    initiative petitions, or independent petitions, you would hire

8    the same type of quality person?

9    A.   We would -- we would attempt to hire the same type quality

10   people.  We do not necessarily have a say in who we necessarily

11   get, as far as temporary workers.  We do have a contract out

12   with a temporary employee agency.  We normally do not have a

13   say.  But I can't speak on the qualifications that that

14   individual agency has whenever they vet their workers.

15   Q.   When you were hiring the temporary workers for the judicial

16   petitions or the initiative petitions, you all didn't have any

17   trouble, you found people that helped you out?

18   A.   We found warm bodies to put at a desk, yes.

19   Q.   And they performed competently?

20   A.   I can't speak for that.  I can't speak for every

21   individual.  Of course, as any agency that uses temporary

22   workers, there can be issues that arise with certain

23   individuals.

24   Q.   You said "can."  Do you know of one worker who fulfilled

25   their job incompetently?  Can you give us their name?

1    A.    I can name more than one.  One would be Highland.  His name

2    was Highland.  He was a great worker, and I believe he's

3    actually on SOS staff now.

4    Q.    Again, I was talking about --

5             THE COURT:  He asked you a little more tricky

6    question.  He was asking you can you name an incompetent worker

7    that you hired that was a temporary worker.  And the first

8    answer to the question, were there any, before we get into their

9    names.

10            MR. LINGER:  That might be a better way to put it.

11   Thank you.

12            THE COURT:  I think you misheard him.  You said, No,

13   we have a really great guy, his name is Highland.  That's not

14   the question.  I think he's asking you, in a general sense, did

15   you have any problems with your temporary workers that

16   interfered with the accuracy of the election.  I'm paraphrasing.

17            MR. LINGER:  Yes, that is correct.

18            THE WITNESS:  There were a handful of individuals, as

19   always, that we deal with that, you know, we have issues with,

20   as far as whether it's accuracy, whether it's competency.

21   There's several factors that could go into that.  However, when

22   those issues arose, we would, you know, reconcile those issues

23   if we found them.

24   BY MR. LINGER:

25   Q.    What does that mean, "reconcile"?

1   A.   We would basically get rid of those temporary workers and

2   ask for different individuals, if need be.

3   Q.   You would get people that could do the job?

4   A.   Yes, sir, we would.

5   Q.   Okay.  So would it be fair to say that because of that

6   experience in hiring temporary workers for the judicial

7   petitions or the initiative petitions, the process is already in

8   the works if you have to hire temporary people to help out with

9   independent candidate petitions?

10  A.   If that need came about, then yes.

11  Q.   Okay.  Thank you.

12  A.   You're welcome.

13  Q.   Now, if you would look at Plaintiff's Exhibit 2, and I'd

14  like you to turn to Interrogatory No. 5.  And, of course, you'll

15  see in that interrogatory -- sir, do you have that in front of

16  you?

17  A.   Yes.

18  Q.   You see where it makes reference to the Eighth Circuit's

19  decision in *Moore v. Martin*?

20  A.   Yes.

21  Q.   And I will tell you, I took a number of these from the

22  questions the Eighth Circuit wanted answered, and one was:

23  "What period of time between the former May 1st petition

24  deadline for independent candidate petitions in Arkansas and

25  early July deadline for initiative petitions in Arkansas," and

1    then I say, "as set forth in the Moore case, were available for

2    the Secretary of State for the State of Arkansas to process

3    independent candidate petitions?"  Do you see that, sir?

4    A.    Yes.

5    Q.    Now, do you see the answer that your office put in here

6    about "assumes facts not in evidence" and basically --

7              MR. KELLY:  Your Honor, I'm going to object because

8    that's a lawyer's answer.  He knows that's my signature that

9    verified that and not the witness's, and not the SOS witnesses

10   either.

11             MR. LINGER:  Well, I'm just asking if he saw that,

12   Your Honor, at this point.

13             THE COURT:  If it's germane to your next question,

14   that's fine, it's of record in there.  But moving past that,

15   what's your question of this witness?

16   BY MR. LINGER:

17   Q.    My question is, is it not a fact, Mr. Bridges, that between

18   May 1st and, like, our current deadline of July 6th, a period of

19   more than two months, that all that time is available to verify

20   independent candidate petitions?

21   A.    Are you asking if I could do it, if I can get it done in

22   that time period, or are you asking if we have any other

23   important dates and deadlines between that time period?

24   Q.    I'm just saying, this was a question the Eighth Circuit

25   wanted answered.  And first off, you're not, in that period of

1   time, which is basically the months of May, June, and the

2   beginning of July, more than 60 days, you're not verifying any

3   judicial petitions, are you?

4   A.    Our office is not, no.

5   Q.    And during that period of time -- have you verified any

6   initiative petitions during that period of time?

7   A.    There's a possibility.

8   Q.    There is a possibility, yes.  But, for example, in 2014,

9   did you verify any petition signatures in that period of time?

10  A.    Not that I recall.

11  Q.    And in 2016, during that period of time, did you verify

12  any?

13  A.    Yes, in June we had an initiative petition turned in.

14  Q.    One petition?

15  A.    One.

16  Q.    Okay.  And did that one require you to hire temporary

17  workers to help you?

18  A.    Yes.

19  Q.    Do you remember?  So you were able to do that.  Now, of

20  course, that was for hundreds of thousands of signatures.

21  A.    Correct.

22  Q.    Now, for 10,000 signatures, or, say, we got an extra

23  50 percent, 15,000 signatures, would that require you all to

24  proceed with the process you've already set up to hire

25  additional workers, if you had to?

1    A.    If we had one petition, one independent petition turned in

2    to our office that requires 10,000 signatures, then, no, we

3    would not hire temporary workers for that.

4    Q.    You wouldn't even have to, would you?

5    A.    No, sir.

6    Q.    Would it be fair to say that in the last seven or eight

7    election cycles, for statewide independent candidates, that the

8    most that's ever been is two, that the usual is only one, and

9    several times there's been none?

10            MR. KELLY:  I'm going to object to the compound

11   question, Your Honor.

12            THE COURT:  Break it down for me, Mr. Linger.

13   BY MR. LINGER:

14   Q.    Have you ever seen a year where there were more petitions

15   for independent statewide candidates than two?

16   A.    I've been on staff since 2013, so, no, I have not.

17   Q.    Okay.  And is it not a fact that in 2014 and 2016, since

18   the law was changed in 2013, that there were no statewide

19   independent petition signatures submitted?

20   A.    Statewide, no; district level, yes.

21   Q.    In 2014 there was exactly one independent petition for a

22   state senate district, right?

23   A.    I believe so.

24   Q.    Okay.  So would it be fair to say that, say, looking

25   particularly in the period we're talking here, that at most

1  there's only one statewide petition submitted for independent

2  candidates?

3  A.   I believe that's relative, but, yes, we have not had any

4  more than two.

5  Q.   And you're saying even if you had an initiative petition

6  like you did that one year, you wouldn't even have to hire

7  anybody extra to verify those petition signatures for that

8  independent statewide candidate, would you?

9  A.   Depending on the number of petitions turned in.

10 Q.   I'm just saying one.

11 A.   One individual, no, we would not hire; we would get that

12 done internally.

13 Q.   Of course, it's still just minuscule compared to the

14 hundreds of thousands for the initiatives, compared to that.  At

15 what point would you have to --

16          MR. KELLY:  Objection, Your Honor.

17          THE COURT:  Hang on a second.  Let me rule on the

18 objection.

19     What is your objection, asked and answered?

20          MR. KELLY:  Yes, about six times.

21          THE COURT:  One last time, Mr. Linger.

22 BY MR. LINGER:

23 Q.   At what point would you think that you all would have to

24 hire temporary workers, like you have for the judicial petitions

25 or the initiative petitions, with independents?  Would it be

1   two, three, four?

2   A.    That's a judgment call we would have to make at that time,

3   because as I stated before, it depends on the positions that

4   those individuals are running for.  Are they state level?  Are

5   they district level?  It depends because signature requirements

6   are different for every one.

7   Q.    Looking at the history, I'm just asking, is it not a fact

8   that if you had five statewide independent candidate petitions,

9   you would have still far less signatures to verify than even one

10  initiative petition?

11  A.    Mathematically, I believe you're correct.

12  Q.    All right.  Now, let me just ask you, as someone who has a

13  position of high authority in the Secretary of State's office,

14  are petitions for independent candidates unimportant?

15  A.    They're very important.

16  Q.    Are they less important than judicial --

17          THE COURT:  Mr. Linger, let's talk about something

18  that's less argumentative than how important everybody is.

19  BY MR. LINGER:

20  Q.    Now, if you would look at Interrogatory No. 7.  Have you

21  had an opportunity to review that, the answers there?

22  A.    Yes.

23  Q.    And do you agree they're accurate?

24  A.    I believe so, yes.

25  Q.    All right.  And do they show -- for example, 7 shows, by

1   year, from these periods of time of 2006 through 2016, how many

2   independent candidate petitions were actually submitted.

3   A.    I believe you're correct, yes.

4   Q.    Does it not also show that while a number of independent

5   candidates may file documents, not all of them follow through

6   and actually submit petitions to be verified?

7   A.    Correct.

8   Q.    And I believe, if you'll look at the year 2006, there were

9   six petitions in that year, total, that were submitted, and only

10  one of them -- actually, none of them -- one of them was for

11  governor.  That was the only statewide race, correct?

12  A.    Yes.

13  Q.    And in 2008, there were only six that ended up submitting

14  petitions, and in that year we had no statewide independent

15  candidate petition.

16  A.    That's correct.

17  Q.    And then in 2010, there were ten independent candidate

18  petitions, and of those, one, U.S. Senate, was statewide.

19  A.    Correct.

20  Q.    And in 2012, we had eight independent candidate petitions

21  that were submitted, but not a single one of them was for a

22  statewide office.

23  A.    Correct.

24  Q.    Now, the Secretary of State, your staff, verifies petitions

25  for, like, the legislature, state senate or state

1    representative, state house, or anything that's like U.S.

2    senator, U.S. representative, lieutenant governor, governor,

3    that sort of thing?

4    A.    Along with judicial, yes.

5    Q.    Well, I'm just talking about for independent, because the

6    judicial, the election isn't at the same time, is it?

7    A.    Right, correct.  You are correct, those are the types of

8    petitions we verify.

9    Q.    Okay.  Now, the easier part, in 2014, when this case got

10   started, you had exactly one independent candidate, and that was

11   just for a state senate district, right?

12   A.    Correct.

13   Q.    And then finally, in 2016, with a U.S. Senate race, no

14   independent candidates filed for statewide office, correct?

15   A.    Correct.

16   Q.    Now, would you characterize this, sir, as representing a

17   burden, of verifying independent candidate petitions, which is

18   substantially and significantly less than the number of

19   signatures you all required every election cycle for judicial

20   candidates and initiative petitions?

21   A.    Given the history of the petitions that have been turned in

22   in the past ten years --

23   Q.    You would agree?

24   A.    Define "burden," because --

25   Q.    Number to be verified.

1    A.    Okay.

2    Q.    You agree with me, don't you?

3    A.    I agree with you, with the caveat that there is work

4    involved with processing and verifying these petitions,

5    regardless of how many are turned in.

6    Q.    All right.

7    A.    And we treat every individual petition equally.

8    Q.    Now, in 2014, after the law was passed and there was only

9    one independent petition signature, Mr. George Pritchett

10   submitted, if you'll look at number 8 of the interrogatories,

11   that was submitted on March the 3rd, and he was notified that he

12   had sufficient signatures 17 days later, on March 20th.  Do you

13   see that?

14   A.    Yes.

15   Q.    If you would look next at number 9, you see where in there

16   I asked for the amount of time to process the independent

17   candidate positions.  Do you think your testimony today has

18   fairly and completely revealed to the Court basically the amount

19   of time that's required to look up someone's name, where they

20   say they live to see if they're a registered voter?

21   A.    If we're talking line by line, yes.

22   Q.    All right.

23   A.    The overall time to process one individual petition,

24   however many signatures that may be, varies from petition to

25   petition, position to position, district to district.

1          THE COURT:  Mr. Bridges, let me distill it down to the

2     criminal equivalent of a marijuana equivalent.  How much time

3     does it take to verify a signature?  And then we can equate that

4     to any other office that requires different signatures.  You

5     follow me?

6          THE WITNESS:  Yes, sir.

7          THE COURT:  Or you can tell me how long it takes to

8     verify a hundred signatures.  I don't really care what the unit

9     is, so long as it's small enough to cover the waterfront.

10         THE WITNESS:  Okay.  Given that we have --

11         THE COURT:  And I'm talking about the average

12    signature.  Some are good, some are bad.  I'm just saying if I

13    sat down and said, Mr. Bridges, I want you to check these

14    hundred signatures, and you went to somebody else and said,

15    Check them for me.  You may be better at it than others.  How

16    long would the average signature checker take to do a hundred

17    signatures?  I guess that's a term of art, "signature checker."

18         THE WITNESS:  I would say, to put it in minute terms,

19    I would say, on average, the time it takes to check one

20    signature would be 12 to 15 seconds, long enough to type in the

21    information, find them in a list of people that may come up in

22    search results.  I'd say 12 to 15 seconds per signature.  And

23    that's a ballpark.

24         THE COURT:  Perfect.  I understand you don't have a

25    stopwatch on.

1    BY MR. LINGER:

2    Q.    Another way to put it, four or five in a minute?

3    A.    On average, sure.

4    Q.    And that's with just one worker?

5    A.    Uh-huh.  Yes, sir.  Sorry.

6    Q.    That's okay.  Now, I remember when Mr. Kelly was asking you

7    about the workers being hired, you said you could probably train

8    people about in a day or less if you had to have temporary

9    workers, right?

10   A.    On average.

11   Q.    Okay.  Okay.  And if you'd look at Interrogatory No. 12

12   where I asked what attempts the Secretary of State had made to

13   explore the feasibility of temporary hiring of additional

14   election workers to process and verify independent candidate

15   petitions, you think what you've testified to here earlier,

16   you've pretty much testified to what you all have done and what

17   needs to be done for that?

18   A.    I believe so.  I believe it would be feasible if the need

19   came about.

20   Q.    And if you would look at Interrogatory No. 13.  Now, I know

21   these are bulk answers, but you agree that y'all's response to

22   number 13 shows the history as to initiative petitions that you

23   all have been able to verify?  Is that correct, sir?  In 2010,

24   there were no petitions submitted, right?

25   A.    That's correct, yes.

1   Q.   And in 2012, you all were able -- they processed over

2   424,000 petition signatures, correct?

3   A.   Correct.

4   Q.   And in 2014, over 257,000 signatures were be able to be

5   processed?

6   A.   Correct.

7   Q.   And in 2016, you had over 511,000 signatures that were able

8   to be processed?

9   A.   Correct.

10  Q.   And as I understand it, those are ones that you all were

11  able to do in that regard without hiring temporary workers?

12  A.   We had to hire temporary workers for all of those, I

13  believe.

14  Q.   And that all worked out, you were able to do that?

15  A.   Yes.

16  Q.   Now, there's been a lot of talk about litigation.  I was

17  wondering -- we know, of course, that you all have to have all

18  the signatures verified for judicial candidates in February,

19  before any deadline, either March 1st or May 1st.  Could you

20  tell the Court, in the last election where there were judicial

21  candidates, how many legal challenges were filed to judicial

22  candidate petitions?

23  A.   For the 2016 cycle, I do not recall.

24  Q.   Okay.  How about the 2014 cycle?  Or maybe there weren't

25  any.  Do you remember?

1    A.    Four to five.

2    Q.    Four to five?

3    A.    (Witness nods head.)

4    Q.    What does "four to five" mean?

5    A.    Four or five.

6          THE COURT:   "Four or five" as opposed to "425."

7          THE WITNESS:   Thank you, Judge.

8    BY MR. LINGER:

9    Q.    Okay.  That's the four or five.  All right.  The people in

10   the Secretary of State's office that check and verify these

11   petition signatures, they're not lawyers, are they?

12   A.    No, sir.

13   Q.    And you all, when you have these challenges, if you feel

14   you need to have someone there, you all send a lawyer to

15   represent you, right?

16   A.    Yes, sir.

17   Q.    So that litigation doesn't affect the people who need to

18   check independent candidate petitions, does it?

19   A.    I do not agree with that.

20   Q.    Okay.  And the litigation on the initiative petitions --

21   now, some years there's none and some two and some four -- do

22   all of them have litigation?

23   A.    Normally, yes.

24   Q.    Every single one was challenged?

25   A.    The 2016 cycle, I do not believe every one was challenged.

1  Q.   Okay.  And in every one of those challenges, of course,

2  that was for something that had a deadline around the 6th to the

3  8th of July for their petitions?

4  A.   Yes.

5  Q.   And except for one, you said someone turned it in early,

6  this was the medical marijuana or something?

7  A.   Correct.

8  Q.   When did they turn theirs in?

9  A.   Mid-June.  I do not recall the date.

10  Q.   Mid-June, okay.  So that would be more than six weeks after

11  a May 1st deadline if that were restored for independent

12  petitions, more than six weeks?

13             THE COURT:  I can do the math.

14             MR. LINGER:  Yes, okay.

15  BY MR. LINGER:

16  Q.   And that's approximately, say, 45 days, a month and a half?

17  A.   Sure.

18  Q.   And isn't that the same period of time, by law, that the

19  Secretary of State's office is supposed to verify judicial

20  petitions, within 45 days?

21  A.   Correct.

22  Q.   And the much larger petition signatures for an initiative,

23  you're supposed to get that done, originally, within 30 days,

24  right?

25  A.   If we're talking only the first submission, yes, 30 days.

1    Q.    Right.  And if they don't have enough, they're given

2    another 30 days?

3    A.    They're given another 30 days to select signatures for the

4    cure.  We, in turn, have an additional 30 days to verify the

5    cure.

6    Q.    And that would be -- at that point we would be talking

7    about several months after May 1st, right?

8    A.    Several months after the deadline in July for initiative

9    petitions.

10   Q.    Can you tell me, if you have to have almost a hundred

11   thousand petitions verified for these judicial candidates within

12   45 days, and the initial, much higher requirement for

13   initiatives at 30 days, why, if you had the months of May and

14   June, let's not even talk about July, that's 61 days, why you

15   couldn't verify independent petitions, without hiring temporary

16   workers even?

17   A.    Let me just say this.  If a petition is turned in in May or

18   June, given that the May 1st date is restored, we would get the

19   job done however we needed to do it.  Now, I can't speak for

20   other dates, deadlines, and duties that we may have during that

21   time because we do much more than just verify signatures.  Our

22   office is very expansive and we have other responsibilities as

23   well.  I do want to get that on record.  But we would get the

24   job done.

25   Q.    Okay.  Good, good.  Do you know of any other states that

1   have such an early deadline for independent candidates, months

2   before the primaries of the major parties?

3   A.    I'm not privy to the knowledge of other state deadlines for

4   petitions.

5   Q.    Now, Interrogatory No. 14, I won't get into the answer that

6   was put there, but one of the questions was, "Does the

7   verification of independent candidate petitions in Arkansas

8   conflict with processing other signature petitions under the

9   former May 1st petition deadline for independent candidates?"

10  Would you not agree that it does not conflict because you're not

11  processing other petitions at the same time?

12          MR. KELLY:  I'm going to object to that question.

13  That states facts that are not in evidence and it's contrary to

14  facts that are in evidence.

15          MR. LINGER:  I'm asking him for his opinion, and I

16  actually think it is not --

17          THE COURT:  Either Mr. Bridges can answer the question

18  or he can't.  He either has the information or not.  What is the

19  time period, from May 1st until when?

20          MR. LINGER:  The petitions would have to be turned in

21  on May 1st.  I'm saying there's no conflict --

22          THE COURT:  Well, I'm asking for the time period that

23  covered your question.

24          MR. LINGER:  The time period would be from May 1st, if

25  petitions for independent candidates were turned in on May 1st

1    of the election year, would processing them, like you do for the

2    judicial ones, through February, or the initiatives that are

3    turned in usually, except for one instance after July 6th or

4    July 8th, is there a conflict there with processing the

5    independent candidates --

6            THE COURT:  And I'm going to ask the question a little

7    different.

8        From May 1st to July 6th, are you processing any other

9    petitions?

10           THE WITNESS:  There is a possibility we could process

11   other petitions, yes.

12           THE COURT:  We know that you can turn in an I and R --

13   if I want to talk the lingo -- early.

14           THE WITNESS:  Uh-huh.

15           THE COURT:  But typically the way the thing is set up,

16   is there any other period, by statute or otherwise, that you

17   would anticipate receiving petitions that weren't filed ahead of

18   the game or early?

19           THE WITNESS:  At the state level, there are no other

20   conflicting petition deadlines between May 1st and July 6th,

21   normally.

22   BY MR. LINGER:

23   Q.   And as you said, you'd get the job done?

24   A.   Regardless, we would get the job done.

25   Q.   So therefore it's not necessary that the petition for

1   independent candidates be on March 1st, is it, because you all

2   can get the job done?

3   A.   I don't feel comfortable answering the question the way

4   it's stated.  Regardless of the deadline, we're going to get the

5   job done.

6   Q.   Now, there were some questions about early voting.  Early

7   voting has been in effect for about 20 years, hasn't it?

8   A.   Roughly, yes.

9   Q.   And early voting was in effect back in the times when the

10  petition deadline for independent candidates --

11          THE COURT:  Slow down, Mr. Linger.

12          MR. LINGER:  I'm sorry, Your Honor.

13  BY MR. LINGER:

14  Q.   And early voting was in effect when the petition deadline

15  for independent candidates was May 1st, wasn't it?

16  A.   I believe it was.  I do not know for sure.

17  Q.   Well, I mean, the thing was changed in 2013, so --

18  A.   So, yes.

19  Q.   Okay.

20          MR. LINGER:  Stipulation 15 that the parties signed

21  noted -- and I had not taken into consideration, Your Honor, on

22  my proposed findings of fact and conclusions of law that the

23  legislature had moved back a week, to June 19, but it is covered

24  in our Stipulation 15.

25  BY MR. LINGER:

1  Q.    There is a general primary runoff election, which is held

2  now four weeks after the preferential primary election, correct?

3  A.    Yes.

4  Q.    For example, for this year, the preferential primary

5  election in which the Republicans and Democrats will try to

6  choose their nominees for the November ballot is on May 22nd,

7  correct?

8  A.    Yes.

9  Q.    And the legislature, for whatever reason, has said that the

10 runoff election, I think the correct name is the general primary

11 runoff election, that is, if a Republican or Democrat, maybe

12 there are three or four Republicans or Democrats running, if no

13 one gets a majority, there has to be a runoff election?

14 A.    That is correct, on June 19th.

15 Q.    And June 19, that's when the ballot can be finalized if at

16 that point we settle on all the Republicans and Democrats,

17 correct?

18 A.    Can you restate your question?

19 Q.    Well, what I mean is, the ballot for candidates for

20 partisan office that an independent might file, say, like for

21 lieutenant governor or state senator, there could be a -- we

22 might not know.  If we had the independents come in by May 1st,

23 we would make a determination there, and if it was done in

24 30 days or 45 days, that would be before June 19th when we have

25 the runoff for the Republicans and Democrats to finalize who

Bridges - Cross

1    their nominees are going to be for all offices, correct?

2    A.    I believe so, yes.

3    Q.    So that actually extends the period of time before you guys

4    are going to know who you're going to be putting on the ballot

5    for these partisan offices for November?

6    A.    Theoretically, yes.

7    Q.    Unless, of course, someone says something was done

8    improperly, say, in the runoff election and there's some

9    litigation, correct?

10   A.    Correct.

11   Q.    And that sometimes happens, right?

12   A.    I would say yes, but our office, I believe, would still

13   have to comply with the certification deadline regardless of

14   litigation.

15   Q.    But in any event, you would agree that wouldn't interfere

16   at all with verifying independent petition signatures for a

17   May 1st deadline, would it?

18   A.    I'm afraid I don't understand your question.

19   Q.    Well, I'm just saying, if one Republican or a Democrat

20   wants to challenge the result of the runoff election that's

21   being held now on June 19, that wouldn't have any effect on you

22   all being able to verify petition signatures turned in for

23   independent candidates on May 1st?

24   A.    I don't believe it would, no, sir.

25   Q.    Okay.  Can you give us an example, prior to 2013, when the

Bridges - Cross

1    law moved independent petition deadlines from May 1st to

2    March 1st, of the Secretary of State's office not being able to

3    timely and competently verify independent petition signatures?

4    A.   I do not recall any time that our office was not able to

5    comply with that deadline.

6    Q.   County clerks, there was some talk about them.  They don't

7    process petition signatures for statewide office, do they?

8    A.   No, sir.

9    Q.   County clerks don't process state legislative offices like

10   state senator or state representative.  Isn't that correct?

11   A.   That's correct.

12   Q.   Defendant's exhibits on pages 10 and 12, the Mark Moore

13   papers there, for what it's worth, do you know if he tried to

14   sign that or if it was actually necessary for him to sign that,

15   just for the record?

16   A.   I believe that's a two-part question.  Number one, was it

17   necessary for him to sign the form?  Yes, I believe it was.

18   Number two, I was not present when he filled out that paperwork,

19   so I can't speak to that.

20   Q.   You don't know if it was snatched away from him?

21   A.   I have no idea.

22   Q.   All right.  Mr. Kelly, I think, beginning around his

23   Defendant's Exhibits 125, 126, et cetera, so on, talked about a

24   new law that has been passed that takes unopposed candidates off

25   the ballot.

1    A.    Yes.

2    Q.    Can you think of any way that has anything to do with this

3    case here that's interfering with you all verifying independent

4    petition signatures that were not going to have unopposed

5    candidates on the ballot?

6    A.    I don't know.

7              MR. LINGER:  I'd ask Your Honor, in regard to

8    Plaintiff's Exhibit No. 1, that footnote 2 be received by the

9    Court.

10             THE COURT:  I'm going to receive his testimony about

11   it.  I'll mark it proffered, but I'm not going to receive it as

12   a separate exhibit.

13             MR. LINGER:  I have no further questions, Your Honor.

14             THE COURT:  Brief redirect?

15                        REDIRECT EXAMINATION

16   BY MR. KELLY:

17   Q.    Does hiring extra temporary help/workers have any impact on

18   the amount of time it takes to litigate the signature challenge

19   to an independent candidate petition?

20   A.    Can you restate the question?  I'm sorry.

21   Q.    Does the Secretary of State hiring extra workers to help in

22   the processing of independent candidate petitions have any

23   impact at all on the length of time that it takes to litigate a

24   signature challenge to an independent candidate petition?

25   A.    No, sir, it does not.

1           THE COURT:  Mr. Kelly, I would state that you would

2    put that in the argument column.  I mean, that's not a question

3    that I need this witness to tell me.  I'm going to let you save

4    all that for argument as opposed to just asking questions about

5    things that it doesn't necessarily take this witness to answer.

6    BY MR. KELLY:

7    Q.   Does that Interrogatory No. 2 that we talked about -- I'm

8    sorry -- the responses on interrogatories that the Secretary

9    made, does that show how many independent candidates were

10   processed by the county clerks?

11   A.   No, it does not.

12   Q.   We talked about this before, so I just want to make sure I

13   go over it again.  In 2016, 2012, 2008, do statewide candidates

14   in Arkansas run in those years or are they all every four years

15   and in lockstep together?

16   A.   State-level candidates are every four years.

17   Q.   That's the '10, '14, '18, '22?

18   A.   Correct.

19           MR. LINGER:  Your Honor, I need to interrupt.  Can

20   Mr. Kelly speak up?  I'm having a little trouble hearing him.

21           THE COURT:  Is your mike on?  You don't have a button

22   on there?

23           MR. KELLY:  I think it's on.

24           THE COURT:  If you could speak up.  Your pace is

25   great, but apparently your volume is down.

1          MR. KELLY:  I want her to get it, but not him.

2          THE COURT:  I understand.

3   BY MR. KELLY:

4   Q.   The time it takes to litigate signature challenges, is that

5   part of the issue that was trying to be addressed in the law?

6   A.   Yes.

7   Q.   Is there a learning curve for the workers who are verifying

8   signatures to learn how to process within 15 seconds, like you

9   said?  Although, I might disagree.

10  A.   There is a learning curve, yes.

11  Q.   Do they process at that same rate throughout the day or do

12  they --

13  A.   I would say no.  If they're anything like me, they're going

14  to slack off a little bit after lunchtime.

15          THE COURT:  Or me.

16  BY MR. KELLY:

17  Q.   Mr. Linger asked a question to which you answered you did

18  not agree.  Mr. Linger asked the question, does litigation

19  affect the Secretary of State employees, who go to litigate,

20  does that affect the Secretary's ability to process petitions?

21  A.   I believe it does, yes.

22  Q.   We talked about the two municipal independent candidate

23  petition deadlines; one that begins on May 2nd, the other that

24  begins on May 16th in 2018.  Do those deadlines conflict

25  directly with the previous May 1st deadline for statewide

1    independents?

2    A.    I believe it does at the county level, yes.

3    Q.    Does it preclude candidates from filing for the two

4    municipal offices if they have a pending petition with SOS?

5    A.    Yes, it prohibits them, I guess you could say, from filing

6    for another office while their petition is pending.

7    Q.    We talked about the judicial races in 2014 arising after

8    the close of the filing period when it became apparent that

9    there was more than one candidate on the ballot for those races

10   where there was a challenge.  Do you recall that?

11   A.    Yes.

12   Q.    Does a signature challenge for an independent candidate

13   usually arise after the conclusion of the primary when the

14   candidates are known who might challenge the independent?

15   A.    I believe they do, yes.

16   Q.    And in the event that there's a runoff primary, does the

17   decision to litigate normally wait until the conclusion of the

18   runoff primary as well?

19   A.    I would say yes.

20   Q.    And the deadlines we're talking about, the May 1st deadline

21   that was moved to March 1st, that deadline applies uniformly to

22   all 75 county clerks, as well as the Secretary.  Is that right?

23   A.    That's correct, yes.

24         MR. KELLY:  That's all I have.  Thank you, Your Honor.

25         MR. LINGER:  Just one question, Judge.

1          THE COURT:  We'll see.

2                    RECROSS-EXAMINATION

3    BY MR. LINGER:

4    Q.   As to previous independent petitions for statewide office

5    in Arkansas, when was the last time there was a litigation case,

6    other than this case, that you can remember where someone turned

7    in petitions, they were verified, and there was some litigation

8    about it?

9    A.   I do not know.  I do not recall.

10         MR. LINGER:  That's all, Your Honor.

11         THE COURT:  You can step down, sir.

12         MR. KELLY:  Your Honor, I have one follow-up.

13              FURTHER REDIRECT EXAMINATION

14   BY MR. KELLY:

15   Q.   Did we identify that case, the case with Mr. Johnny Weaver

16   in 2006?

17   A.   Yes, we did.  I apologize.  We did.

18         THE COURT:  Now you can step down.

19         THE WITNESS:  Thank you, Your Honor.

20         THE COURT:  We're going to take about a 15-minute

21   break to give those who need it an opportunity to enjoy it.

22       How much longer are we talking about on testimony?

23         MR. LINGER:  If I may address something first?  The

24   only thing I wanted to do, Your Honor, and I don't know how

25   important it is, just for the record, I was going to call Mr.

1    Moore so that he could then authenticate footnotes 1 and 3 of

2    his exhibit.  That was it.

3               THE COURT:  What do you mean "authenticate"?

4               MR. LINGER:  Just how he came up with what he put in

5    that footnote.  That would take me ten minutes.

6               THE COURT:  Well, okay.

7               MR. LINGER:  He stepped out.  But I promise, that's

8    it.

9               THE COURT:  All right.  Well, that helps me.  We're

10   off the record until 1:45.

11        (Recess from 1:34 p.m. until 1:48 p.m.)

12               THE COURT:  All right.  We're back on the record.

13        Mr. Kelly, I'm not sure you rested on or off the record.

14               MR. KELLY:  I have not rested on the record.  I just

15   wanted to make sure before I do, I think I got the ruling, I

16   just wanted to make sure I've made a motion for admission of all

17   of our exhibits and they were all admitted.

18               THE COURT:  My recollection is, all of your Exhibits 1

19   through, perhaps, 187, if my memory serves, have been received.

20   Do you have any in addition to those?  Or 188.

21               MR. KELLY:  Nothing more.

22               THE COURT:  They were all received.

23               MR. KELLY:  Defendant rests.  Thank you.

24               THE COURT:  Mr. Linger?

25               MR. LINGER:  Very briefly, Your Honor.  We call Mr.

1    Moore to the stand.

2             **MARK MOORE, DEFENDANT'S WITNESS, DULY SWORN**

3                         DIRECT EXAMINATION

4    BY MR. LINGER:

5    Q.    Would you please state your name for the record.

6    A.    Mark Moore.

7    Q.    Mr. Moore, you're the plaintiff in this case?

8    A.    I am.

9    Q.    All right.  And you've been present during our hearing

10   today?

11   A.    Yes.

12   Q.    You have a copy of Plaintiff's Exhibit No. 1.

13   A.    I do.

14   Q.    Is that something you prepared as an exhibit for this case?

15   A.    Yes.

16   Q.    Now, I'd like to call your attention to footnotes 1 and 3

17   in this exhibit.  In regard to footnote 1, is that something you

18   prepared yourself?

19   A.    Yes.

20   Q.    And did you base that on the law in Arkansas, as to what

21   you're referencing there?

22   A.    Yes, I got it out of one of the two sources that are stated

23   at the bottom, the "Arkansas Ethics Commission 2014 handbook for

24   candidates," or the 20 -- yeah, that was it.

25   Q.    And is it true and correct?

1    A.    Yes.

2    Q.    And I actually see three footnotes.  I'm talking about the

3    note, it just says "Note."  Do you see that?

4    A.    Yes.

5    Q.    Is that something you also prepared --

6    A.    Yes.

7    Q.    -- in explanation for your chart here?

8    A.    Yes.

9    Q.    And is it true and accurate?

10   A.    Right, yes.

11   Q.    And then while I asked Mr. Bridges about this, footnote

12   number 2, is that something you also prepared?

13   A.    Yes.

14   Q.    And did you believe it was true and correct?

15   A.    Yes.

16              MR. LINGER:  No further questions, Your Honor.

17                          CROSS-EXAMINATION

18   BY MR. KELLY:

19   Q.    Hi, Mr. Moore.  How are you?

20   A.    Good.

21   Q.    Just a couple of questions.  You did not bring any

22   petitions with you today, did you?

23   A.    I can't hear you.

24   Q.    You didn't bring any petitions with you today, did you?

25   A.    I did not bring any petitions with me today.

1   Q.   And you have not attempted to gather petitions --

2           MR. LINGER:  Your Honor, I'm going to object.  This is

3   beyond the scope of direct examination.

4           THE COURT:  How far beyond the scope of

5   cross-examination are you going, or going to go, Mr. Kelly?

6           MR. KELLY:  There's a standing issue I just want to

7   clarify because I think it's my burden to prove it.  And not

8   only that, Your Honor, but he was on our witness list as well.

9           MR. LINGER:  Your Honor --

10          THE COURT:  You rested without calling him.  I mean,

11  I'm willing to allow a couple of questions that may have to do

12  with footnotes 1 or 2, but I wasn't prepared for you to have a

13  separate witness during your case in chief.  I understand you

14  have a standing issue.  I'm going to allow you a few brief

15  questions, but let's get to it.

16          MR. KELLY:  And I --

17          THE COURT:  And I understand it's your burden of

18  proof, but that doesn't mean that the order of proof is altered

19  by your burden, I guess is what I'm saying.  One doesn't

20  necessarily answer the question to the other.  But I'm going to

21  give you a little leeway.  Ask your questions.

22      The last question I think was:  You didn't bring any

23  petitions with you?  And you said no.

24          THE WITNESS:  No, sir.

25          THE COURT:  Okay.

1    BY MR. KELLY:

2    Q.    Have you tried to gather petitions for this cycle?

3    A.    No, nor did I try to when I ran as independent in 2012.  I

4    didn't try to until after I filed.  And really all this is

5    about, I want to get on the ballot on equal terms with

6    Republicans and Democrats who can wait until the last day of the

7    filing period to decide if they want to run or not.  And that's

8    the way I ran as an independent in 2012.  We decided the night

9    before the last full day of the filing period.  And I know that

10   treating people equally under the law is sometimes a burden, but

11   I just think it validates -- it ruins what your office stands

12   for if it's not an outcome of what you do.

13   Q.    And in your affidavit, which is Exhibit No. 2, you said you

14   refused to gather signatures.  Is that right?

15   A.    I still can't you hear you.  I'm sorry.

16            THE COURT:  Where is the affidavit in Exhibit 2?

17            MR. KELLY:  SOS page 2.

18            MR. LINGER:  I'm renewing my objection.  This is

19   beyond the scope of direct and it's immaterial.

20            THE COURT:  Well, Exhibit 2 is in the record,

21   Mr. Kelly.  And what is your question about 2?

22            MR. KELLY:  Did he refuse to gather signatures in 2012

23   -- 2014.

24            THE COURT:  Like his affidavit says?

25            MR. KELLY:  Like his affidavit says, yes.

1    BY MR. KELLY:

2    Q.   Is your affidavit true and correct?

3    A.   I'm sorry, sir.  I just cannot hear you.  Could you slow

4    down and speak into the microphone?

5           THE COURT:  He asked if your affidavit was correct,

6    and I was going to give you a chance to look it over.

7        (Witness reviews document.)

8           THE WITNESS:  Yeah.

9           MR. KELLY:  That's all.

10          THE COURT:  All right.  You can step down, sir.

11       I assume that you're re-offering the bottom half of your

12   Exhibit 1?

13          MR. LINGER:  Yes, Your Honor.

14          THE COURT:  Any objection, Mr. Kelly?

15          MR. KELLY:  No, Your Honor.

16          THE COURT:  Be received.

17       (Plaintiff's Exhibit 1, bottom portion, received in

18   evidence.)

19          THE COURT:  Do you rest, Mr. Linger?

20          MR. LINGER:  Yes, Your Honor, we rest.

21          THE COURT:  All right.  I'm going to give you all an

22   opportunity to -- I guess, Mr. Linger, I'm asking you, were you

23   able to distill a concise statement of what your relief

24   requested is?

25          MR. LINGER:  Yes, Your Honor.

1          THE COURT:  All right.  And what is that?

2          MR. LINGER:  Well, first, we were asking that the law

3    in question here, which set a March 1st deadline for petitions

4    of independent candidates, in this case it's particularly as to

5    statewide office, be declared unconstitutional, that it is not

6    narrowly tailored and it is unnecessary to have a March 1st

7    deadline.  So that would be the first declaratory relief.

8          Then secondly, while we do think the legislature could

9    direct us, we would also ask the Court to issue injunctive

10   relief as to the plaintiff only, that he be allowed until at

11   least May 1st, or whatever date the Court thinks is appropriate,

12   to turn in any petitions for this election cycle for an

13   independent candidacy.  That would be what we would request,

14   Your Honor.

15         THE COURT:  All right.  Mr. Kelly, you're up.

16         MR. KELLY:  Do you want my closing or just response to

17   his relief issue?

18         THE COURT:  You can combine them.

19         MR. KELLY:  The Secretary asked for judgment as a

20   matter of law based on failure to join the county clerks under

21   Rule 19.  This is not a class action.  There's been no notice to

22   the clerks that this law is in issue and yet it affects them

23   equally with the Secretary of State.  It was an issue that was

24   raised in our answer.  I believe it was raised in our motion to

25   dismiss.  I'm renewing my motion to dismiss, or motion for

1    judgment as a matter of law based on the failure to serve the

2    county clerks or any representative of them.  They are subject

3    to service of process in this state.  They will not deprive the

4    court of subject matter jurisdiction, and they must be joined if

5    the court cannot accord complete relief among the existing

6    parties, which I believe you cannot because they don't know

7    anything about this case.  And remember the clerks are the ones

8    that prepare the ballots, not the Secretary.

9         There is a risk of incurring inconsistent obligations

10   because, as we've seen, the signature-gathering period had

11   begun, and there's been no notice, as well, to other potential

12   independent candidates who have already started gathering

13   signatures, as Mr. Bridges testified, without dispute; they've

14   called our office, they've asked for what the dates were, they

15   started to go out and get them.  It would be harmful to them as

16   well to grant relief which changes the deadline and would force

17   them to disregard signatures they've already gathered.

18        I also want to renew our motion to dismiss and the motion

19   for judgment as a matter of law --

20             THE COURT:  Slow down, Mr. Kelly.  You renew your

21   motions.  I got that far.

22             MR. KELLY:  -- our motion on lack of standing because

23   there is no injury-in-fact.  There was no injury-in-fact in

24   2014.  The reason Mr. Moore was not on the ballot independently

25   was because he failed to file and sign his notice of candidacy,

1    which has nothing to do with our office.  The injury for that

2    was not caused by defendant.  More than that, it's not

3    redressable now to change what happened in 2014.  There's been

4    no amendment of the complaint, and yet we're asking for relief,

5    we're here on relief concerning the 2018 election cycle.

6          I do also want to remind you, Your Honor, that the

7    Secretary is the beneficiary of your earlier ruling, which

8    granted judgment on our summary judgment motion concerning the

9    other litigant in the case.  That is law of the case.  We're

10   entitled to rely on that and have been relying on it as we talk

11   to and address other potential independent candidates and clerks

12   who call our office, because it's a final judgment, undisturbed

13   on appeal.

14         Mr. Moore has to proceed in an as-applied challenge only as

15   to himself and not facially or as to other people who have not

16   been joined or are not aware of this litigation.

17         Mr. Harrod was the one dismissed.  And I do have to make a

18   correction to our pretrial brief, or our pretrial -- yeah, to

19   our pretrial brief.  I believe I mistook Mr. Harrod and

20   Mr. Johnson.  Mr. Harrod is the one who had judgment against

21   him.  Mr. Johnson was dismissed without prejudice and has not

22   refiled.

23               THE COURT:  Thank you for that correction.

24               MR. KELLY:  Under *Lujan*, a Supreme Court case, the

25   plaintiff cannot bootstrap his request for injunctive relief for

1    which he might have standing as to himself, because he

2    definitely does not have standing as to any others.  The

3    requested relief is divisible, so the declaratory relief as to

4    him might be an adequate remedy.  Request of declaratory relief

5    as to others would harm other people and shouldn't be granted;

6    likewise, with injunctive relief, especially if it harms

7    independent candidates who have timely done things under the

8    law, as they understood it to be, which began the

9    petition-gathering deadline, or the signature-gathering period

10   on December 1st of this year.

11        *Phillips Petroleum v. Shutts*, a 1985 Supreme Court case,

12   says that other people are entitled to notice of these kinds of

13   actions before their rights are affected and they should have

14   the right to opt out or opt in.  No such notice has been given.

15   That was a class action.  This is not a class action.

16        In every right-to-vote case there is an inherent conflict

17   between casting a ballot, which is the affirmative right that

18   Mr. Moore seeks to vindicate, versus the counting the ballot, or

19   the dilutive issue, the defensive action that we seek to

20   vindicate.  So there's a conflict of rights.  It is not that one

21   trumps the other.  It is in all of these election type cases,

22   there is a conflict of rights, and the people who want to have

23   their vote cast without dilution are entitled to the same kind

24   of protection that Mr. Moore is seeking.  They had no notice of

25   this case going forward, and it will surprise them, as well as

1      the legislators, that this case comes about.

2          Mr. Moore said in his affidavit, and this is what we

3      understood in 2014 when this case came up, that he refused to

4      gather signatures and can show no actual harm.  There isn't the

5      question -- there's no factual question about the difficulty of

6      collecting signatures.  There simply isn't because there's a

7      complete and total absence of proof on that issue.  To the

8      contrary, the Secretary put in, in response to the summary

9      judgment, that the nonpartisan petition-gathering period

10     overlaps and was successfully executed by a number of different

11     nonpartisan candidates.  Undisputed today.

12         I want to remind you again that you denied summary judgment

13     to the plaintiff initially for failure to meet his burden of

14     showing that there were no disputed issues of material fact.  He

15     hasn't put on anything more in front of you today to change the

16     outcome of that ruling, and we're entitled to the benefit of

17     that ruling, as you are.

18         The response to request for admissions and the

19     acknowledgment that are part of the Secretary's proof also show

20     that Mr. Moore was well aware of the requirements and decided on

21     his own not to attempt to meet them.

22         It appears indisputably to me that there is no standing in

23     this case.  I realize that we lost that issue in your court

24     earlier.  We did not appeal that ruling.  And I believe that

25     that ruling is open to be revisited on remand.  And there was a

1   change in the law or clarification by the Supreme Court in 2016

2   in the *Spokeo* case.  I want to --

3            THE COURT:  Spell *Spokeo*.

4            MR. KELLY:  S-p-o-k-e-o.

5            THE COURT:  Got it.

6            MR. KELLY:  As part of our -- excuse me for just one

7   second, Your Honor.  As part of our closing, I want to make sure

8   that you understand that I believe the law has changed or at

9   least been clarified by the Supreme Court in that sense.

10            THE COURT:  You find it.  And while you're looking for

11   it, I want to state for the record that I've allowed you to

12   supplement the record with the citations we've discussed off the

13   record in lieu of a posttrial brief.  You were going to submit

14   citations to various laws that we discussed, without

15   Mr. Linger's objection, but it wasn't going to be in argument.

16   I threw that in again because it just occurred to me.

17      Go ahead.  We were talking about *Spokeo*.  I was looking in

18   your brief and I haven't been able to find it, if that's where

19   you were looking for it.

20            MR. KELLY:  I'm looking for it too.  Oh, it's number

21   5.  "Plaintiff has the initial burden to show that he has a

22   concrete injury-in-fact, that the injury actually exists in a

23   real sense and not merely in an abstract sense."  That's 136

24   S.Ct. 1540 at page 1547.

25            THE COURT:  Okay.

1          MR. KELLY:  We've gone through and talked before about

2     the question of whether this should be a facial challenge or

3     as-applied.  The outcome must be different on this remand

4     because the other plaintiff had judgment entered against him and

5     did not appeal.  I'm very concerned because I do not believe you

6     can overrule yourself as to the other plaintiff, Mr. Harrod.  He

7     is precluded from getting the benefit of a better deadline

8     because your prior ruling is res judicata and collateral

9     estoppel and law of the case.  You come back to *Washington State*

10    *Grange v. Washington State Republican Party*, *Crawford v. Marion*

11    *County Election Board*, the law that says that we, the Secretary

12    of State, have the right to change the law in anticipation of

13    events that may happen as a result of the way the law is,

14    without the necessity of proving that that change was required.

15    *Crawford County v. Marion County* is a 2008 Supreme Court case,

16    important distinction for this reason.  It postdates *Meier v.*

17    *McLain*, which is the Eighth Circuit case frequently cited the

18    other way, and it may be slightly different than what the

19    dissent had in the Eighth Circuit opinion.

20         It is plaintiff's burden to show that he's met the

21    requirement of standing under *Storer*, *Anderson*, *New York State*

22    *Board of Elections*, and *Lopez Torres;* that's Justice Kennedy's

23    opinion in that case.  And then a Ninth Circuit case, *Nadar v.*

24    *Brewer*, *Swanson v. Worley* from the Eleventh Circuit, and the

25    *Timmons* case from the Supreme Court, as well *McLain* from the

1   Eighth Circuit in 1988.

2        Mr. Moore also had the responsibility of showing that the

3   state's ballot access requirements have seriously restricted the

4   availability of political opportunity, which I don't believe he

5   has done.  That's *Arizona Green Party v. Reagan*, *Libertarian*

6   *Party of Washington v. Munro*, both Ninth Circuit cases.

7             THE COURT:  It looks like you're reading from your

8   defendant's proposed findings of fact and conclusions of law,

9   which I have the benefit of.  I don't know if it becomes part of

10  the record or not.

11            MR. KELLY:  So far it's not.  That's my problem.  I

12  want to make sure it does.

13            THE COURT:  Well, for what they're worth, does either

14  party have any objection to me making both proposed findings of

15  law and -- I mean, if all you're going to do is read to me

16  y'all's proposed findings of fact and conclusions of law, I can

17  do that.  I've been reading along with you and not much has been

18  added to the comments that you've been making.  I can sit

19  patiently by and let you finish or we can agree to file these as

20  addendums to your pretrial briefs.  I'm not sure if those were

21  filed either.

22            MR. KELLY:  The pretrial briefs are not, Your Honor.

23            MR. LINGER:  Only the disclosure sheet was filed by

24  each of us.  And I have no objection to both the trial brief and

25  the proposed findings of fact and conclusions of law being filed

1    by the Court.

2            MR. KELLY:  I have no objection.

3            THE COURT:  All right.

4            MR. KELLY:  Knowing that those are safely in, I just

5    want to focus on the things that we talked about today.

6            THE COURT:  Great.

7            MR. KELLY:  So the things we talked about today are

8    that election calendar and the potential deadlines and

9    conflicts, trying to address the Eighth Circuit's issues, but

10   primarily from the perspective that the county clerks, who are

11   not necessary parties and are not here, and many of those

12   conflicts arise because they are the ones so seriously impacted.

13       I understood what the cross-examination of Mr. Bridges was

14   about, I understood that, based on a narrow view of the Eighth

15   Circuit's opinion, it might appear that we don't, quote, have a

16   conflict, unquote.  But remember Mr. Hammonds said in his

17   affidavit and Mr. Bridges said in live testimony today that

18   there are actual conflicts of law given the previous May 1st

19   deadline; that's those two municipal filing periods, that if you

20   lose out on your independent candidate petition, if you cannot

21   file or your petition is thrown out because you don't have a

22   sufficient number of valid signatures of registered voters,

23   you're precluded from running for those municipal offices.  And

24   part of the basis, as we said in 2014, part of the basis for the

25   change in the law was to make sure that that conflict between

1    independent candidates for other offices, municipal candidates

2    in the city administrator form of government, which is a

3    May 16th deadline, and then other municipalities that have the

4    right to have their filing period from May 1st to May 19th or

5    May 20th, the change in the law helps failed candidates to run

6    for other offices because there was a direct conflict.  It might

7    not have been inside of the Secretary's office, but it was

8    inherent in the law.  If you're filing with the Secretary and

9    you try to file with the county, you're going to get caught if

10   you try to run for more than one office at the same time.  That

11   has actually happened.  There's a 2013 or '14 case, or 2014 case

12   where the Supreme Court said we are taking you off the ballot

13   for this race.  It was out of Phillips County, and I've

14   forgotten the name.  And I apologize.  We're taking you off the

15   ballot for this race because you ran for two things at the same

16   time and you can only run for one.  End of discussion.  I

17   believe we stated that previously.  I can't recall whether it's

18   this case or the *Libertarian Party* case because these things run

19   together.

20        Other than that -- let me just take one look at my calendar

21   to make sure that I touched on all the bases, because there's a

22   couple of other deadlines I want to make sure you're aware of.

23        The fact that the clerks are conducting early voting and

24   the burdens imposed on them, Your Honor, part of the issue is

25   that the clerks make their complaints known largely to the

1    Secretary or to the legislature when they consider things to be

2    too much of a burden on their things and their requirements to

3    do.  You'll see, and we discussed today, how the laws have been

4    changed to ease the burden on the clerks repeatedly.  You go

5    back and you look at the change in the law in 2011, it is to

6    roll back all the deadlines so that they can meet their UOCAVA

7    obligations, as well as the Secretary.  You look at the change

8    of the law in 2013, 2015, 2017, the law is the same largely for

9    all of them.  And the question about whether or not the change

10   in having uncontested candidates on the ballot or not on the

11   ballot, that's a significant issue for clerks who are conducting

12   early voting who are faced with furious voters who come into the

13   polling location and they walk out without having voted because

14   they can't wait for more than an hour at lunchtime.  And if

15   people are waiting because there's frivolous things on the

16   electronic ballot, that's the kind of thing that the Secretary

17   and the legislature are allowed and indeed encouraged to do

18   under the prevailing law, which we did cite in our brief.

19        The issue of how much time does it take to process a

20   petition is not the sole issue for our consideration.  The

21   critical factual issue is, how long does it take to litigate,

22   because *Langguth* said both of those things were allowed as the

23   state's interest, how long it takes to process and how long it

24   takes to challenge and do the litigation.  And remember, a

25   single panel cannot overrule another panel.  And God bless Judge

1    Wollman, I don't think that he would overrule himself on that

2    issue, and he didn't.  They didn't change what the law -- the

3    Eighth Circuit opinion in this case did not change what the law

4    was in *Langguth*, and *Langguth* said it is a valid, legitimate

5    state interest to allow time for the litigation challenges to

6    signature petitions.  And we showed earlier today about how a

7    litigation signature challenge has to be done.  Unlike a

8    challenge to an initiative, it has to be done before the

9    certification deadline in August because of UOCAVA.  You cannot

10   send out candidates -- more than two candidates on a single

11   ballot and then go back and try to not count the votes for one

12   of the three, because if you do, you've harmed one of the other

13   two candidates.  Like I said, in the defense of you want to have

14   your vote counted without dilution, you would be diluting the

15   vote for one or two of the other candidates who remains on the

16   ballot.  That's why independent candidate processing and the

17   litigation involving them must be resolved before a much earlier

18   deadline, which is not intuitive and which adheres because of

19   UOCAVA and the MOVE Act.  I don't think that shows on the

20   record.  I don't think it showed to the Eighth Circuit.  I'm not

21   sure it was clear before, but I believe it's crystal clear now.

22   Resolving the litigation is critical.  The Secretary has no

23   control over what the supreme court does, what the court of

24   appeals might do, even how long it takes a trial court to bring

25   things to trial.  I know that the election code says election

1    law matters shall be heard within seven days.  I know trial

2    judges -- I won't mention any circuit judge by name.  But I know

3    trial judges who say:  That's really nice.  We have a scheduling

4    order and we have rules of court which say something different.

5    That's part of the problem, that this law was also intended to

6    allow additional time for litigation, which takes longer and

7    longer and yet must be resolved before the certification date in

8    August.

9         For those reasons, I think the Secretary has met its

10   burden.  And if you include the county clerks as part of this

11   law, I ask you to dismiss this case, I ask for judgment as a

12   matter of law in favor of the Secretary, and I ask you to deny

13   any injunctive relief whatsoever, because injunctive relief is

14   something that definitely is an issue where standing is the

15   critical key.  And even if someone has standing for declaratory

16   relief, that doesn't necessarily mean that he has standing for

17   injunctive relief, and I believe that the plaintiff does not

18   have any standing for injunctive relief beyond himself in this

19   matter.

20        Thank you, Your Honor.

21             THE COURT:  Mr. Linger.

22             MR. LINGER:  May it please the Court.  We ask the

23   Court for declaratory relief, declaring the law with the

24   March 1st deadline unconstitutional.  Injunctive relief, we do

25   ask relief for the plaintiff, Mr. Moore, that he be allowed at

1    least until May 1st.  This issue in this case has been

2    litigated, as Your Honor has noted in your original decision, as

3    the Eighth Circuit noted over the last three or four decades

4    numerous times, they've moved the deadline all over.  I think as

5    the U.S. Supreme Court has noted, and I think we cited in our

6    briefs, the interest of independent candidates, third parties,

7    are not foremost in the minds of legislatures composed of the

8    two major parties.  It should not surprise any of us that when

9    they make laws, they do not think of the minority voices in

10   politics and they often set up things, which they have achieved,

11   to a certain extent, in pretty much greatly reducing the number

12   of independent candidates in Arkansas.  These candidates are

13   important; maybe they might not be so successful in winning

14   elections, but they're important that we have a full First

15   Amendment discussion of political issues, and that's why the

16   court has always said that it's important these laws have to be

17   reviewed and seriously considered.

18        Now, in this case we are, I think, under the doctrine of

19   the law of the case, and I think the Court hit upon that

20   correctly.  The Eighth Circuit had what I had broken down into

21   five questions that needed to be answered, because two of the

22   judges, at least, thought that the record was not sufficient

23   there.  One of the judges did think it was sufficient.  And I

24   think that we have had those five questions answered in such a

25   way that it has been shown that the March 1st deadline is not

1    necessary.  And I think what's been shown here from their own

2    discovery and from the testimony of Mr. Bridges, they're up to

3    the task, they can do it.  There has not been a conflict in

4    regard to independent candidate petitions in the past, and there

5    would not be by a later deadline in May.  They have already

6    shown, the last question the Eighth Circuit asked, about the

7    feasibility of hiring temporary workers, they've already done

8    that in the much greater requirements for judicial petitions or

9    initiative petitions, and they could do that, if necessary,

10   although the evidence has overwhelmingly shown from the past

11   that there just aren't going to be anywhere near as many

12   independent petitions to verify.  And if there are, I noted in

13   Mr. Bridges' testimony when he was talking about the one worker

14   could verify four or five in a minute, and I think he said it

15   was 12 to 15 seconds to verify, that's four to five in a minute,

16   240 to 300 in an hour, or 1,920 to 2,400 for a single worker in

17   an eight-hour day.  There is a reason why the legislature of

18   Arkansas has set forth up to 45 days to verify this hundred

19   thousand or more signatures for judicial petitions and why they

20   have 30 days for the initial and then another 30 days for

21   hundreds and hundreds of thousands of initiative petition

22   signatures.  The number of signatures that need to be verified

23   for independent petitions pales to insignificance in comparison.

24   And as Mr. Bridges says, they can get the job done, and they

25   don't even appear to even have to hire anybody additional.

1      We are asking -- and this standing issue, Your Honor, since

2   you're going to have it filed, my trial brief, I would have you

3   look at pages 5, 6, and 7, in those three pages.  I knew that

4   Mr. Kelly was going to bring up this standing issue.  As I

5   anticipated he was going to do that, I wanted to cite to Supreme

6   Court cases:  The *McLain v. Meier* case, of course, which was

7   cited by you, and it was also cited by the Eighth Circuit in its

8   decision; and, also, I even cited some of the *Williams v. Rhodes*

9   case where the court even talked about political parties and

10  groups, they didn't even try to comply with the law and yet they

11  had standing.  This standing issue I think has been beaten to

12  death in this case.  You ruled in favor of Mr. Moore on

13  standing, mootness, ripeness.  The Eighth Circuit did not

14  challenge that.  That was never an issue as to standing.  They

15  made comments that he had a right, as you noted, not just as a

16  potential future candidate, but, as the Eighth Circuit has

17  recognized before, as you recognized, and as the Eighth Circuit

18  in this case recognized, as a registered voter in the state of

19  Arkansas, because what's more important than even a candidate's

20  rights is the right of a voter to cast his vote effectively.

21  And that's why he has standing.  That's why you ruled, I

22  believe, originally in his favor.  That's why the Eighth Circuit

23  ruled in his favor.  They brought that up again in the U.S.

24  Supreme Court on their petition for cert and were turned down.

25  I mean, we've gone over that enough.  But my final word on it,

1    because I thought they were going to mention it, is on pages 5,

2    6, and 7 of my trial brief.

3         And so, Your Honor, I do think that the evidence, I would

4    say, that this is not necessary, that there is not a conflict,

5    that they can get it done as they did in the past, as they can

6    in the future, is I would say overwhelming that they have not

7    met their burden, it's not necessary, and we ask the law be

8    declared unconstitutional.

9         This case specifically, though, is devoted to a statewide

10   candidate in Arkansas.  I think it's limited in that regard.

11   Mr. Harrod, who did not appeal, was not a statewide candidate,

12   and even if he had been, that would not be binding on another

13   plaintiff in denying him his right on appeal.

14        So, therefore, because under the doctrine of the law of the

15   case and the questions that I think have been answered in such a

16   way to show that the Secretary of State has not met his burden,

17   we ask for the appropriate declaratory and injunctive relief,

18   Your Honor.

19            THE COURT:  I'm not going to rule from the bench.  I

20   will likely give you my broad stroke decision earlier than my

21   written order so you can react one way or the other.  I'll have

22   that decision made, obviously, well in advance of my written

23   order being released.  I will do my best, in light of impending

24   holidays, to get it out as quickly as possible.  As we discussed

25   either on or off the record, I'm not sure, that you'd like to

1    have it by January the 2nd.  I will do my best to get that done.

2    I would anticipate that you would have my general decision, if

3    not my order, before then.  It's not going to take me that long

4    to make a decision.  It may take me longer to get an order for

5    all of these various issues that need to be done.

6         Gentlemen, thank you all for being as concise as you were.

7    It was well briefed, well argued.  And y'all both slowed down

8    this time, on occasion.

9         Is there anything else?

10        MR. LINGER:  There's just one thing.  I had said

11   earlier this morning about Eighth Circuit rule, I called it, I

12   think, 32.A1.  It's actually 32.1A.  So I just wanted to get the

13   letter in the right order.

14        THE COURT:  All right.  Y'all have a good Christmas.

15        (Proceedings adjourned at 2:28 p.m.)

16                   REPORTER'S CERTIFICATE

17        I certify that the foregoing is a correct transcript from

18   the record of proceedings in the above-entitled matter.

19

20   /s/ Eugenie M. Power, RMR, CRR, CCR        Date:  March 30, 2018
     United States Court Reporter

21

22

23

24

25

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter